EDWARD A. SEYKOTA, ET AL., [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Seykota v. Commissioner
Docket Nos. 14936-82, 47868-86, 6720-87, 31972-87
United States Tax Court
T.C. Memo 1991-234; 1991 Tax Ct. Memo LEXIS 263; 61 T.C.M. (CCH) 2706; T.C.M. (RIA) 91234; May 28, 1991, Filed *263 Decision will be entered under Rule 155. During the years in issue, petitioners engaged in "Arbitrage and Carry" transactions in the Futures Trading, Inc. program, and/or in spread transactions in the related Merit T-Bond, T-Bill or stock forward contract programs. In each instance, petitioners intentionally sustained losses in the first year of their investments. Participants in the Arbitrage and Carry program deducted losses relating to the acquisition and holding of gold. They also, with other participants in the Merit programs, intentionally incurred losses by entering into closing transactions with respect to selected positions in their investments. Held, transactions in the Merit T-Bill, T-Bond and stock forward contract programs were factual shams and losses therefrom are disallowed. Held further, even if petitioners' Merit transactions had a factual existence, the transactions lacked economic substance and a business or profit-making purpose. They were therefore shams in substance and losses and deductions derived from those transactions are disallowed on this basis. Held further, even though petitioners' transactions in the Arbitrage and Carry program *264 had a factual existence, the transactions lacked economic substance and a business or profit-making purpose. Therefore, they were shams in substance and losses and deductions arising from participation in that program are disallowed. Held further because the transactions in issue were factual or economic shams, petitioner Seykota may not claim entitlement to the provisions available to a "commodities dealer" for purposes of the Deficit Reduction Act of 1984, as amended by the Tax Reform Act of 1986. Held further, petitioner Calhoun is allowed a deduction for management fees paid. Held further, Seykota is entitled to a deduction for certain interest claimed. Held further, additions to tax and increased interest on deficiencies attributable to tax-motivated transactions are sustained. Stuart E. Seigel[2], F. Whitten Peters, Matthew D. Lerner, Marie T. Reilly, and William M. Wiltshire for the petitioners. Robert McDonough and Richard Hindlian for the petitioner in docket No. 14936-82. [3]
*265 Theodore L. Craft for the petitioners in docket No. 6720-87. William C. Sabin, Jr., Marsha Keyes, Kathleen E. Whatley, and C. Ted Sanderson for the respondent. DAWSON, Judge. PANUTHOS, Special Trial Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A(b) of the Code and Rules 180, 181, and 183. [4] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PANUTHOS, Special Trial Judge: By timely notices of deficiencies, respondent determined that petitioners in these consolidated cases were liable for deficiencies and additions to tax as follows: 6653(a)(1)
6653(a)(2)
Docket No.
Names
Year
[5] Deficiency Additions
Additions
14936-82
Edward A.
1978
$ 1,783,620
-
-
Seykota
1979
$ 3,063,567
1980
$ 5,396,898
47686-86
Robert B.
1978
$ 41,930   * *266 $ 2,097 -
and Jane
1979
$ 89,150   * $ 4,458 -
Henry
1980
$ 22,385   * $ 1,119 -
1981
$ 3,264   $ 163   50% of in-
terest due
on $ 3,264
6720-87
Bruce L. &
1980
$ 1,189,694
* $ 59,485
-
Jacqueline
1982
$ 855     $ 43      50% of in-
R. Calhoun
terest due
on $ 855
31972-87
Martin S.
1980
$ 119,073  * $ 6,355 -
& Lauri E.
1981
$ 249,603  $ 13,495  50% of in-
[6] Tepper terest due
on $ 249,603
1982
$ 65,398   $ 4,118   50% of in-
terest due
on $ 65,398 Respondent claimed additional adjustments in an Amendment to his Answer in docket No. 6720-87, which we granted leave to file on July 31, 1989. Therein, respondent seeks to disallow the Calhouns' deduction of certain fees paid for investment advice. If we sustain respondent's disallowance of those fees, the Calhouns' *267 deficiency for 1980, as set forth above, increases. In his amendment to answer, respondent also proposed to disallow a short-term capital loss for 1982 in the amount of $ 298,134. If respondent sustains his burden on this item, the deficiency for 1982 will not be affected. By motion filed on January 12, 1990, respondent moved to amend his answer in docket No. 14936-82 to assert an addition to tax for negligence under section 6653(a). We denied respondent's motion to amend on February 22, 1990. During the years at issue, petitioners all invested in the "Arbitrage and Carry" ("A/C") program of Futures Trading Inc. ("FTI"), and/or in the related spread transactions offered by the Merit T-Bond, T-Bill or stock forward contract programs. These cases have been selected by counsel for the parties and consolidated to provide a test case for the investors in those programs. After concessions, the issues presented are: (1) Whether transactions on the Merit T-Bill option, T-Bond option, and stock forward contract markets were factual shams; (2) Whether the FTI A/C program and Merit T-Bill option, T-Bond option, and stock forward contract transactions lacked economic substance; (3) *268 Whether petitioners had a primarily for profit motive for their participation in the FTI A/C and Merit T-Bill option, T-Bond option, and stock forward contract markets; (4) Whether Edward Seykota qualifies for the per se presumption of section 108(b) as a "commodities dealer" with regard to losses in transactions between June 11, 1980, and June 23, 1981; (5) Whether certain petitioners in the FTI A/C program and Merit T-Bill option, T-Bond option, and stock forward contract markets are entitled to deductions for interest, management fees, or related expenses; (6) Whether any part of the underpayment of tax due from certain petitioners is due to negligence; and (7) Whether petitioners are liable for the 120 percent interest rate for tax-motivated transactions pursuant to section 6621(c), formerly section 6621(d); (8) Whether Martin S. Tepper and Lauri E. Tepper are liable for the additions to tax under section 6651(a)(1) for the years 1980 through 1982. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. At the time the respective petitions in these cases were *269 filed, petitioner Edward A. Seykota ("Seykota") resided in Las Vegas, Nevada; petitioners Robert B. Henry ("Henry") and Jane Henry were married and resided in Kentfield, California; petitioners Bruce R. Calhoun ("Calhoun") and Jacqueline Calhoun were married and resided in Peterborough, New Hampshire; and petitioners Martin S. Tepper ("Tepper") and Lauri E. Tepper were married and resided in Woodland Hills, California. Our use in this opinion of terms such as loss, gain, position, spread, straddle, option, market, trade, and transaction, is not necessarily to be construed as a finding that the transactions at issue are, or are not, valid for Federal income tax purposes. Rather, the use of such terms is only for convenience. 1. The FTI/Merit Program
Futures Trading, Inc. ("FTI") was incorporated in the State of California on November 18, 1971. FTI's original president and sole shareholder was Leon Richartz ("Richartz"). Merit Securities, Inc. ("Merit") was incorporated in Delaware on August 16, 1979. Leema Enterprises, Inc. ("Leema") was incorporated in the State of Delaware on August 23, 1979. Thereafter, Leema operated as a holding company for a group of corporations *270 controlled by Richartz, which included FTI and Merit. Richartz was the sole shareholder of Leema until April 1980, when he sold 15 percent of his stock to Maria Rivera ("Rivera"). Rivera sold her stock back to Leema in December 1986. At all relevant times, Richartz was the controlling shareholder and chief executive officer of Leema, and the chief executive officer of both Merit and FTI. The principal offices of Merit and FTI are located in Tiburon, California. Merit and FTI shared the same offices with Leema and its other subsidiaries. Merit and FTI also shared the same computer system, the same employees, and the same back office systems. Hal Koegler ("Koegler") was the vice-president of FTI and president of Merit. Randy Hecht ("Hecht") was the controller for FTI and the vice-president and chief financial officer of Merit. Rivera was the chief financial officer and secretary of FTI. FTI was a financial planning organization. Among its principal programs was the Arbitrage and Carry ("A/C") program. Merit was a corporation that operated a market for options in Government securities, and, later, stock forward contracts. A significant feature of FTI's A/C program involved *271 trading in the Merit markets. Richartz was the principal figure in the A/C program. He created the program, promoted it and, directly or through his subordinates, made all trading decisions for all participants. Richartz was also responsible for creating the Merit markets in T-Bill options, T-Bond options, and stock forward contracts. Koegler was responsible for bringing about trades on the Merit markets for the participants, including trades that generated desired tax effects. Hecht monitored the FTI/Merit trading objectives and, specifically, the participants' tax objectives. Operating under Richartz' instructions, Hecht received tax targets from investment advisors by mail or by telephone and recorded them. Merit sought to achieve those targets by generating appropriate trades. Richartz hired Leonard Auerbach ("Auerbach") to develop formulas for pricing Merit's options. In the course of his employment, Auerbach developed computer programs which determined a minimum and maximum tax write-off, as well as a tax write-off ratio. His programs enabled Merit to set up the trades needed to meet tax targets. Auerbach also traded on the Merit stock forward contract program as *272 a "market maker" for clients of FTI and Merit. A. The A/C Program
On October 3, 1978, FTI issued a disclosure memorandum entitled "Arbitrage and Carry - Metals, Currencies, and Government Securities." The memorandum described an investment program to individuals who were referred to FTI. The first part of the program functioned as a gold cash and carry program. In this program, FTI arranged financing for its investors to purchase futures contracts for the acquisition of gold bullion. The investors also acquired corresponding futures contracts to sell an equal amount of gold at a stated time after acquisition. The plan was that the investor would take possession of the gold under his "long" futures contracts and later sell the gold at a profit under his "short" futures contracts. Under normal conditions, the future, or "forward," price of gold exceeds the current, or "spot," price. An investor could make a profit if his costs of acquiring and holding the gold were less than the difference between the spot price at which he acquired the gold and the forward price at which he would sell it. Investors in the A/C program were advised that the possibility of an "inversion" *273 provided an additional opportunity for profits. An inversion occurs in a commodity market when the spot price of the commodity rises above its forward price. According to the theory, an investor who owns a sufficient quantity of a commodity during an inversion can achieve large profits because he can sell the commodity at the high spot price for a profit. He can cover any remaining obligation to sell the commodity by acquiring a new futures contract to sell at the prevailing lower forward price, which, in the case of an inversion, would be lower than the current spot price. Even though the gold market was volatile in the late 1970s, a full inversion in the gold market has not occurred since World War II. As a general rule, the sales price of the gold to be sold in the future will exceed the purchase price by an amount roughly equal to the carrying costs. The carrying costs to an FTI investor for acquiring and holding the gold included storage, handling, insurance, monitoring and management fees, and interest. Before 1981, an investor was able to deduct these expenses for purposes of computing his Federal income tax. An amendment to the Internal Revenue Code contained in the *274 Economic Recovery Tax Act of 1981 ("ERTA") changed the tax consequences flowing from "cash-and-carry" arrangements. Following the enactment of that measure, carrying charges had to be capitalized and not deducted. After the enactment of ERTA, the number of participants in the FTI A/C program dropped precipitously. The A/C program was promoted strictly by referral. FTI paid finders' fees to people with whom it did business and who referred clients to FTI. Between 1978 and 1980, FTI paid finders' fees to Albert J. Alessandra ("Alessandra"), Donald Haberlein, James Pearce, Dr. Rusty London ("London"), and some others. To assist its investors in financing gold acquisitions for the A/C program, FTI entered into a Memorandum of Agreement ("MOA") with Chase Manhattan Bank ("Chase") and Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") on October 20, 1978. Under the MOA, each investor was required to open two accounts at Chase, an operating bank account and an assembly bank account. Each investor was also required to open an operating brokerage account and assembly brokerage account at Merrill Lynch. [7]
*275 Each A/C participant executed a written agency agreement with FTI. To assemble a carry on behalf of an investor, FTI would enter into contracts to purchase gold and longer-term contracts to sell an equivalent amount of gold. These contracts were financed using the money in a client's assembly account. Once both contracts had been acquired, the holdings were transferred into the client's operating accounts. Chase required each client to keep 5 percent of the net equity value of his holdings in his Chase operating account. As long as this 5-percent balance was maintained, Chase agreed to finance up to 90 percent of acquisitions plus 100 percent of the "variation margins" (discussed below) required by Merrill Lynch. Chase satisfied itself that the gold carry was potentially profitable before advancing funds. The advances were secured by the gold contracts and by the gold bullion actually acquired. FTI arranged for Merrill Lynch to be the broker that cleared the actual gold contract sales, although the brokerage firm Shearson, Hayden & Stone ("Shearson") also arranged and cleared some orders. Merrill Lynch required the investors to maintain a margin account representing a small *276 percentage of the investors' holdings. Changes in the market value of these holdings could cause the amount of the initial margin to drop below the required percentage. Accordingly, additional amounts, called "variation margins," were required in that instance. As noted, Chase agreed to finance variation margins at a cost of increased interest to the investors. Richartz ordered and executed all trading for the A/C program. He contacted floor brokers to fill FTI's futures contract orders on regulated exchanges. Occasionally, FTI went through Alessandra to deal with some of the floor traders with respect to FTI trades. FTI often ordered these trades in large blocks, and FTI contacted Merrill Lynch or Shearson to allocate the trades among A/C program accounts. Delivery of the gold pursuant to futures contracts was accomplished by delivery of negotiable warehouse receipts for the gold. The actual receipts went to Chase, which held them as collateral for its loans to the investors. FTI charged a variety of fees for its services. Under the terms of the MOA, FTI could charge a maximum of 9 percent of amounts invested as a one-time fee, additional one-time fees for additional capital *277 contributions, up to 5 percent of the amounts invested as an annual management fee, a profit-sharing fee of 20 percent of profits, and a termination fee. Additionally, Richartz advised promoters of the A/C program that there was a 4-percent fee based upon tax benefits sought by the investors. Initially, FTI assured the participants that they would be free of downside risk. The language of the FTI agency agreement limits the client's risk to his initial cash contribution plus "the amount of any deposit required after a debit balance call under section 2.02C." Section 2.02C limits any debit balance call to $ "0.0." The margin requirements for the Merit participants were designed to charge the client the largest amount of money that he could lose on any given trade. The FTI A/C program had a reputation as a tax-motivated program. FTI kept records of its clients' tax needs, which it designated as "tax targets." FTI also generated documents for use by its "investment advisors" which focused on the tax consequences of transactions. These documents included a graph describing "Tax Savings" in multiples of projected earnings for the investors. In 1979, FTI initiated a program whereby *278 computer analysis included a client's tax target in computations regarding a client's A/C program. Richartz also promoted the tax benefit aspects of the A/C program by generating detailed tax analyses of investments which set forth details such as long-term capital gains, tax preference exposure, earned income, investment income, and taxable income. In one instance, Richartz wrote to a potential investor advising that he "formulated the following target (plan) regarding (the investor's) investment interest in precious metals. Included in the plan are the projected taxable consequences of the investment activity." A detailed matrix attached to the letter summarized the client's tax targets, and the letter and the matrix together presented a sophisticated multi-faceted analysis of the tax ramifications of an investment. The documents assumed substantial profits over a 3-year period, but the tax advantages, which extended over a period of 7 years, were the principal subject of Richartz' letter. Although the assumed profits set forth in those documents served to illustrate the tax advantages associated with investing in the A/C program, Richartz did occasionally emphasize economic *279 profits. For example, he justified gold trades to one investor on the basis of the prices he obtained and only incidentally mentioned the tax advantages gained by selling under favorable capital gains rates. For all investors, the initial year of investment in the A/C program produced losses, both economically and for tax purposes. B. The T-Bill and T-Bond Options Program
Richartz advised FTI's clients that the value of a contract to sell gold in the future was sensitive to changes in the interest rates. Interest on amounts borrowed to acquire and hold the gold represented a substantial component in the carrying costs. Increases in interest rates during the time of the carry accordingly reduced the potential profit margin available at the price at which the investors had agreed to sell. Richartz proposed a mechanism to "hedge" exposure to interest rate fluctuation. A "hedge" is an investment that is made to offset an adverse economic performance of another investment. For example, if the profit of an investment required a rise in market prices, a hedge to that investment could be established to profit from a fall in the market prices. Effective use of hedging *280 instruments requires careful analysis of the exposure involved. The costs of hedging and the possibility that the hedge may diminish the profitability of the program being hedged each require quantification of the expense and duration of the hedging activities as they relate to the investments hedged. In 1979, Richartz established Merit Securities, Inc., ostensibly to establish a market in instruments offering the hedging characteristics required by FTI A/C investors. Richartz advised that trading based upon Treasury securities, which are interest-sensitive obligations, was a means of offsetting the adverse effects of interest rate changes upon the FTI gold carries. The FTI A/C investors were all put into the Merit programs as an integral part of the FTI program. Others, such as Calhoun, invested in the Merit markets without participating in the FTI A/C program. Beginning in November 1979, Merit offered two over-the-counter markets for the purchase and sale of spreads and combinations of spreads in put and call options on Treasury Bills ("T-Bills") and Treasury Bonds ("T-Bonds"). T-Bills are non-interest-bearing short-term obligations of the United States with a maturity of *281 one year or less. They are sold at less than face value, and the discount reflects the fact that a period of time must elapse before the bill reaches maturity. The difference between face amount and purchase price represents interest. T-Bonds are interest-bearing long-term obligations of the United States generally having maturities in excess of 10 years. They are issued with a stated coupon interest rate and stated maturity. Because T-Bills and T-Bonds pay stated rates of interest, their value is directly affected by changes in the interest rate. An increase in the interest rate will lower the market value of a given T-Bill or T-Bond, while a decrease in the interest rate will increase the same bond's or bill's market value. Because of this propensity, investors can assemble positions in T-Bonds or T-Bills to hedge other interest-rate sensitive investments, such as the gold carries involved in the A/C program. Only options in T-Bills or T-Bonds were sold on the Merit market. The two types of options which Merit sold were puts and calls. A put option consists of a contract giving the holder of the contract the right to sell the T-Bill or T-Bond involved at a particular price *282 on a particular date. A call option is a contract giving the holder the right to buy the subject security at a particular price on a particular date. The price of an option is referred to as a "premium." The price at which the T-Bill or T-Bond would be bought or sold upon exercise of the option is the "strike" price. An investor who purchases or sells such a contract is said to have established a "position." When an investor holds only one contract or a series of identical contracts, he is said to have an "open position." All the options sold on the Merit markets, however, were sold in the form of "spreads." [8] A spread is a hedged position composed of two substantially offsetting option positions. For example, an investor assembles a spread by purchasing a put option and selling (or "granting") an equivalent put option. Each option constitutes a "leg" of the spread. In the Merit markets, the legs of the spread were a purchased and a sold option -- either both puts or both calls. Each leg in such spreads had identical expiration dates, and each dealt with identical T-Bills or T-Bonds. In each spread, the T-Bills or T-Bonds involved had identical principal amounts and identical *283 maturity dates. [9]
In an open position, price changes in the underlying asset directly affect the value of the futures contract. In the case of a spread, however, the holder is both a purchaser and a seller of the same asset. Accordingly, when the market price of the underlying T-Bill or T-Bond changes, the price of each of the *284 legs changes as well: one appreciates in value while the other depreciates. The movements in each leg do not necessarily equal each other and the price differential between them could change. A gain or loss would be incurred if the price differential widens or narrows, but there would be no gain or loss if the spread remains constant. The profit or loss potential of a spread is measured by the increase or decrease in the price differential between the legs. Ownership of a spread involves less risk than owning an open position because the spread is less volatile than the price of either leg. Therefore, the profit potential is less than that of an open position, and margin requirements are lower than those for open positions. The instruments traded over the Merit option markets were not listed on any formally organized exchange. These instruments were not registered with the Securities and Exchange Commission and were not marketed anywhere outside the Merit market. Accordingly, no bargaining mechanism existed to fix their price. Merit thus utilized other means to fix the price for options sold on its markets. Richartz hired Auerbach to develop formulas for pricing Merit's *285 options. Auerbach developed and refined an option pricing formula for Merit which yielded a "nominal price" theoretically equal to the market clearing price that would have applied in an open outcry market. Auerbach's pricing formulas were based upon the Black-Scholes option pricing model. The Black-Scholes formula is an algorithm designed to evaluate an option on stock at some point before the option's expiration. See Black and Scholes, "The Pricing of Options and Corporate Liabilities," 1973 J. Pol. Econ. 637. Since the Black-Scholes formula does not apply to government securities, Auerbach modified the formula to apply to pricing T-Bill and T-Bond options. Specifically, T-Bills and T-Bonds, unlike corporate stock, tend to rise to par value as the maturity date approaches. Auerbach attempted to adjust Merit pricing for this convergence, called in the industry "gravitational pull." The derivation of a price provided Merit with a basis to begin trading in any particular option on a given date. In operating its markets, Merit first estimated the "at-the-money" strike price for a given option -- that is, the price which would produce neither a gain nor loss to a purchaser upon *286 the expiration of the option. Merit calculated the premiums to be charged for the option based upon that price. In the Merit option markets, an investor's gains or losses for tax purposes were based upon the difference between the premium for the opening and the premium for the closing. Auerbach also developed computer programs which determined a minimum and maximum tax write-off ("TWO"), as well as a tax write-off rate. These programs automatically selected a switch transaction [10] from a variety of potential strike prices. The programs then determined the ratio of the minimum tax write-off to the net cash outlay, or the "TWO rate." One such program could not proceed until it had determined the set of potential strike prices that yielded a minimum tax write-off, "usually 4/1." Once a minimum TWO was established, the programs were designed, in Merit's terms, to "generate switch options and ending payoff economics." *287 In 1979, six investors traded in the Merit T-Bond option market; 32 investors traded in the T-Bond option market in 1980. There were 38 T-Bill investors in 1979, 54 in 1980, and six in 1981. Distinct patterns are apparent in the Merit markets. Merit identified its option trading sequences with a "trade number." Initially, a specific group of Merit investors were included within each trade number. Those investors engaged in an open-switch-close sequence of transactions. They only traded with each other or with Merit "house" accounts. Merit would assign the investors within a certain trading sequence to one of two trading sides, identified as "A" or "B" on Merit monthly statements. This meant that one side sold a certain position, and the other side bought it. The members of one side never took a position opposite another member of the same side on the days of a trade in their sequence. The Merit trades could be very complex. They required sophisticated computer programs to be identified and they produced voluminous paper records. A representative transaction is shown in petitioner Calhoun's T-Bond transactions for 1980-1981. These transactions are shown in the table below *288 and explained in the text which follows: Number
Transaction
Bond
Exercise
Option
Strike
Purchased
Date
Maturity
Date
Type
Price
or Sold (-)
1.
12/12/80
11/94
1/5/81
Call
$ 814,063
-285
2.
12/12/80
11/94
1/5/81
Call
$ 815,000
285
3.
12/12/80
11/94
1/5/81
Put
$ 814,063
-285
4.
12/12/80
11/94
1/5/81
Put
$ 815,000
285
5.
12/17/80
Cash
-0-
-0-
6.
12/24/80
11/94
1/5/81
Put
$ 814,375
250
7.
12/24/80
11/94
1/5/81
Put
$ 815,000
-250
8.
1/5/81 11/94
1/5/81
Call
$ 814,063
285
9.
1/5/81 11/94
1/5/81
Call
$ 815,000
-285
10.
1/5/81 11/94
1/5/81
Put
$ 814,063
285
11.
1/5/81 11/94
1/5/81
Put
$ 814,375
-250
12.
1/5/81 11/94
1/5/81
Put
$ 815,000
-35
13.
2/17/81 Cash
-0-
-0-
Transaction
Cash Account
Gain/Loss
Date Premium
Transactions
Accounts
1.
12/12/80
$ 23,100
-0-
-0-
2.
12/12/80
-$ 22,743
-0-
-0-
3.
12/12/80
$ 22,755
-0-
-0-
4.
12/12/80
-$ 23,323
-0-
-0-
5.
12/17/80
-0-
$ 1,100,000
-0-
6.
12/24/80
-$ 2,550 -0-
-0-
7.
12/24/80
$ 2,635 -0-
-$ 5,172,000
8.
1/5/81 -$ 45,937
-0-
-$ 6,508,545
9.
1/5/81 $ 45,000
-0-
$ 6,343,245
10.
1/5/81 -0-
-0-
$ 6,485,175
11.
1/5/81 -0-
-0-
$ 637,500  12.
1/5/81 -0-
-0-
$ 816,305  13.
2/17/81 -0-
-$ 794,070  -0-
*289 On December 12, 1980, Calhoun's Merit account established the following positions: (1) He sold 285 call options, in each of which he agreed to sell on January 5, 1981, T-Bonds with a face amount of $ 1 million, maturing in November 1994. The strike price at which he agreed to sell the bonds in each option was $ 814,063. For making this sale, he was credited on Merit's books with a premium of $ 23,100 per option. (2) On the same date, he bought 285 call options, each of which gave him the right to buy $ 1 million in face value of identical bonds on January 5, 1981, at a strike price of $ 815,000. For this purchase, Merit debited his account a premium of $ 22,743 per option. (3) Still on December 12, he sold 285 put options with a $ 814,063 strike price for a premium of $ 22,755. (4) On the same date he also bought 285 puts each at a strike price of $ 815,000 and a $ 23,323 premium. (5) On December 17, 1980, five days after trading in his account began, his account was credited with $ 1,100,000, the only cash payment into the account. (6) On December 24, 1980 Calhoun began a "switch" transaction when he bought 250 puts at a strike price of $ 814,375 and a premium of $ 2,550 *290 each. (7) Keeping his account balanced, on December 24, 1980, he also sold 250 puts at a $ 815,000 strike and a premium of $ 2,635 each. Merit treated the latter sale transaction (No. 7) as a "realized" loss in view of the fact that Calhoun's sale of 250 puts offset the same amount of his purchases in transaction No. 4, above. This transaction yielded a net loss on premiums of $ 20,688 per option ($ 23,323 - $ 2,635 received). The total "realized" loss was $ 5,172,000 ($ 20,688 x 250). Calhoun deducted this amount as short-term capital loss for his 1980 tax year. On January 5, 1981, Calhoun, through Merit, made the following offsetting transactions: (8) He bought 285 calls at a strike price of $ 814,063 and a premium of $ 45,937 per call. This offset the initial sale of calls at the same strike price made on December 12, 1980, and resulted in a loss of $ 22,837 per option, or a total loss of $ 6,508,545 (($ 23,100 - $ 45,937) x 285). The loss resulted from Calhoun's purchase of options at almost twice the price he paid for them 3 weeks earlier. (9) On the same date, Calhoun sold 285 calls at a strike price of $ 815,000, for a premium of $ 45,000. This offset another purchase *291 (transaction No. 2) and resulted in an ostensible gain of $ 6,343,245 (($ 45,000 - 22,743) x 250). (10) The holder of the 285 puts which Calhoun sold on December 12, 1980, did not exercise the option. Consequently, Calhoun kept the premium on the sale, undiminished by any costs of offsetting positions. The result is a gain of $ 6,485,175 ($ 22,755 x 285). (11) Calhoun, however, did not exercise the 250 puts which he purchased for $ 2,550 each on December 24, 1980. The lapse of this option produced the loss of his total premiums on that transaction, or $ 637,500 ($ 2,550 x 250). (12) Calhoun also did not exercise the remaining 35 puts he purchased at a strike price of $ 815,000 for a premium of $ 23,332. This produced another loss in the amount of $ 816,305 ($ 23,332 x 35). When the gains and losses of the year-end activity are totalled, a loss of $ 305,930 is reached. That amount was deducted from the cash deposited in the account, leaving a balance of $ 794,070. This amount was deducted from the account on February 17, 1981, resulting in a zero balance in the account. For tax purposes, Calhoun reported $ 5,172,000 in capital losses in 1980. The ending transactions, which *292 took place on January 5, 1981, left a short-term capital gain of $ 4,866,070, [11] deferred until that year. Six sets of orchestrated trades or trading sequences took place in the 1979 Merit T-Bill option market. In the 1979 Merit T-Bond option market, there were two. In each of these sequences, only three trading dates were involved. The first occurred in the second week of December 1979, when the investors "opened" a position by buying (or selling) an option spread from (or to) members of the other side. On December 28, 1979, every participant "switched" by buying or selling options that would offset the loss leg of his opening position. Then, on January 2, 1980 (for T-Bond trades) or on January 4, 1980 (for T-Bill trades), each investor would buy or sell offsetting positions or would allow his options *293 to expire unexercised. Merit's records show that, on the switch dates, every T-Bill investor realized a loss that would have been ordinary in nature and that every T-Bond investor realized a loss that would have been short-term capital in nature. For each of these investors, the amount of the loss recorded in the switch date was approximately equivalent to the gain realized a few days later on the closing dates in the new year. In 1980, trading in the Merit option accounts was slightly more complex but it followed the same basic open-switch-close pattern. There were 27 T-Bill trading sequences and, of these, 24 followed the 3-date open-switch-close pattern. Ten of these trades did not involve December-January trading. Instead they duplicated the open-switch-close pattern and took place shortly before and shortly after the end of the investors' fiscal years, which differed from the calendar year. [12]
*294 The 1980 T-Bond market was different. There were 16 trade sequences traded and, of these, six followed the 3-date open-switch-close pattern. The other ten numbered sequences, however, did not follow that pattern. Richartz or his associates selected trades in other sequences, often apparently to create a holding period sufficient to generate long-term capital gains. [13] Those ten trade numbers all had option expiration dates of June 15, 1981. Participants in the Merit option markets paid Merit a fee through its "bid/ask" structure. The "bid" was the amount paid for a purchased option and the "ask" was the amount to be received. Merit retained the difference between these two amounts -- the bid/ask "spread." With few exceptions, the bid/ask spread existed only on the opening transaction of *295 a given trade sequence, and not on switch or close days. Merit set the bid/ask prices order to produce a "fair profit to Merit." At times, Merit arbitrarily set the bid/ask spread to favor certain of its customers. Merit recorded each capital transaction on monthly statements of account. It sent these statements to each market participant for each month in which there was activity in his account. In ordinary option markets, traders do not exercise most of the options acquired. Instead they allow the options to lapse, or they offset the obligations held with new options. Nevertheless, in a minority of cases, exercise of the options does occur. In Merit's T-Bill and T-Bond markets, however, none of the petitioners, nor any of the other Merit investors, exercised his options to purchase or sell the T-Bills and T-Bonds at issue. C. The Stock Forward Contracts Program
In 1981, Merit implemented a program involving forward contracts on stock. In a forward transaction, one party contracts to deliver a commodity to a second party at a future date (the "settlement date") at a fixed price. A forward contract differs from an option contract in that a forward contact involves *296 the sale of a future obligation to buy or sell the underlying commodity. An option involves the sale of a right to buy or sell that commodity. A forward contract differs from futures contracts in that a forward contract is usually a private arrangement between two parties for the delivery of a specified asset sometime in the future. In the case of a futures contract, the contracts contain standardized terms and are traded through a regulated board or exchange. Another difference is that actual forward contracts, unlike futures contracts, are usually made with the intention that delivery of the underlying asset will be accomplished. During the years in issue, none of petitioners, nor any of the other investors in Merit's stock forward contracts program, either made or took delivery of the stock that was the subject of the forwards contracts. [14]
*297 Merit's forward contracts were written on common stocks traded on the New York Stock Exchange or on the American Stock Exchange. Although it ostensibly offered open positions in stock forward contracts, Merit only traded in spreads or combinations of spreads. In a stock forward spread, an investor would engage in both a long contract to purchase stock from Merit at a future date and specified price and an equivalent short contract to sell the same stock to Merit at a future date and specified price. Auerbach also developed the pricing formula for the contracts traded in connection with Merit's stock forward contract program. Auerbach's method was a "cost-of-carry" formula in which the present value of the stock is multiplied by a factor indicating interest and dividend components over a period of time. The result is the price for stock to be delivered in the future. Merit's offering memorandum for its stock forward contract program advised that the holder of a stock forward contract position had three alternatives for acting with respect to that position: (1) He could hold the contract to maturity and take (or make) delivery; (2) he could obtain Merit's cancellation, thus releasing *298 him from his obligations under the forward contract; or (3) he could engage Merit's services "as a broker" to assign his obligation to some other participant. Merit effectively controlled the fees and assignment prices in such transactions. A "cancellation" is generally used in market places to describe the correction of an error. Merit's promotional brochure, however, indicated to the investors that a cancellation may support claiming ordinary loss deductions rather than the generally less favorable capital losses: Alternatively, an investor may, from time to time, negotiate with Merit to cancel his obligations under a particular Forward Contract, rather than sell or perform under such Forward Contract. Under these circumstances, such investor may take the position that losses, if any, realized upon the cancellation of a Forward Contract are ordinary losses, on the basis that a cancellation is not a "sale or exchange" for tax purposes and thus, that the "sale or exchange" prerequisite to capital gains treatment has not been met.
Client records indicate that cancellations were a significant way of closing out Merit forward stock transactions. For example, Alessandra reported *299 that in 1981 one Merit client "incurred a loss of $ 2,250,340.06 * * * as a result of cancellation fees paid on the liquidation of forward contracts." Alessandra reported similar 1981 cancellation fee losses of $ 1,000,100 for another client. Tepper himself incurred a $ 197,069 loss due to Merit stock forward contract cancellation fees. Merit developed the stock forward contract program after an amendment to the Internal Revenue Code was enacted as part of the Economic Recovery Tax Act of 1981 ("ERTA"), Pub. L. No. 97-34, 95 Stat. 172. ERTA added section 1092 which provided that losses from commodity straddles, such as the Merit T-Bill or T-Bond options, would be recognized only to the extent they exceeded unrealized gain on the offsetting portion of the straddle. Merit, in the promotional brochure for the stock forward contract program, took the position that stock forward contracts were not subject to this legislation. The new Merit stock forward contract programs were not, in fact, subject to section 1092. [15] They nevertheless provided the same "open-switch-close" tax planning opportunities formerly available in the T-Bill and T-Bond straddles. Thus, an investor could close *300 out the loss leg of his stock forward contract straddle, replace it with a new forward contract in a "switch," and deduct the resulting losses. In the next year he would close out the deal and realize his gains, presumably at long-term capital gains rates. For the stock forward contracts market, Merit supplied "pro forma" printouts showing possible profits in the participant's account based upon supposed stock prices or dividends. In the Merit stock forward contract market, there were never more than 63 participants. For the year ending December 31, 1981, the first year of operation of the stock forward contract account, each petitioner's A/C account lost money. The results of first-year investing for the Merit stock forward programs for petitioners are as follows: Name--Account
First year gain (loss)
Seykota--No. 645
($ 10,955,700)
Island---No. 651
[16] ($ 489,980)    Tepper---No. 675
($ 450,010)   Calhoun--No. 695
($ 4,075,950) *301 Like the FTI program, the Merit markets had a separate reputation of engaging in tax-advantaged programs. Merit's managers kept records of its client's tax needs and designated those needs as tax "targets." Internal memoranda of FTI's auditors explained the raison d'etre of FTI's T-Bill program: "Client also has Treasury Bill Option transaction to create ordinary loss and long-term capital gain." Merit's files further show that the stock forward contract program was "set up to benefit from taxes". A training handout captioned "Merit Tutorial" shows that spread trading in stock forward contracts would result in small economic gains or losses but substantially larger tax deductions. Merit's computer programming was capable of tracking deviations from the aggregate tax benefits targets of the stock forward contract investors. The investment advisors and client representatives who referred their clients to the Merit stock forward contract programs did so by stressing tax benefits. 2. Investment Advisors and Client Representatives
The FTI A/C program and the Merit programs required that clients be represented by investment advisors who made trading decisions and who placed *302 the trades. FTI itself acted as the investment advisor for all participants of the A/C program. Other "investment advisors" were salesmen who received up to 37 1/2 percent of the initial fees and management fees paid by the customers to FTI. Alessandra was one such investment advisor; he conducted his activities through Gamma Capital Corporation. He was also the "Marketing Director" of FTI's A/C program and an employee of Shearson. Additionally, Richartz used Alessandra as a broker to execute the gold trades of the FTI program. These trades were executed on accounts held by Merrill-Lynch, and Alessandra received no commission for the trades. He did, however, receive a percentage on the standard Shearson commission as an employee of Shearson. Alessandra also received substantial fees from Merit for bringing approximately 25 clients into the stock forward contract market. He was an experienced trader who knew that investments in Merit would generate ordinary losses followed by capital gains. He gave specific tax advice to investors in the stock forward contract market. In one instance, he advised a client in an October 5, 1981, letter that: We can complete the work we *303 started out to do which will give you ordinary loss this year and no other tax consequences. It will require an additional 50% of what you put in last year in the T-Bill option program. * * * We have achieved a large ordinary loss but a large short term gain. What is important is that we move the short term gain to long term next year.
To achieve the client's tax goals, Alessandra telephoned Hecht at Merit and requested specific tax losses for his clients. Hecht recorded these targets on an FTI form. Seykota was Calhoun's investment advisor in the Merit T-Bond option program and in the stock forward contract program. Seykota did not order option trades for himself or Calhoun but only advised Merit officials whether he believed interest rates would rise or fall. Seykota was, however, very aware of the tax benefits associated with Merit straddles. When Calhoun incurred a $ 14 million capital gain in 1980, Seykota arranged for Calhoun's participation in the Merit program. As shown above, Calhoun realized a $ 5.172 million capital loss to partially offset the capital gain. Merit routinely sent Seykota information regarding the option trades made on his or his clients' *304 behalf, but Seykota did not monitor the daily activity closely. However, he did visit the Merit offices in Tiburon a few times a year. London also operated as one of FTI/Merit's investment advisors. [17] His associate, Robert Schenkman ("Schenkman") served as a "client representative" for Tepper and for Island Investments, Ltd. ("Island") -- the vehicle through which Henry invested in FTI/Merit. London received a finder's fee for referring clients to FTI, and he paid part of these fees to Schenkman. Schenkman is a certified public accountant, having practiced accounting for more than 20 years. Although he disclaimed experience in commodity markets and government securities, Schenkman was able to make extremely *305 accurate tax projections to partners of Island regarding their losses. For example, on July 11, 1979, Schenkman predicted that Henry would incur an ordinary loss of $ 141,844 from FTI. On his tax return for that year, Henry claimed an ordinary loss of $ 139,694. On July 31, 1980, Schenkman wrote the partners of Island predicting that, on their total investment of $ 487,000, their gains would be taxed at favorable long-term capital gain rates and, further, that the partnership would incur an ordinary loss of $ 1,100,000. Island did, in fact, report capital gains and claim an ordinary loss from Merit of $ 1,136,138 on its partnership return for that year. Schenkman advised the Island partners that the cost for achieving this long-term capital gain, coupled with the equivalent ordinary loss, was "approximately $ 20,000, which will cover the fee due Futures Trading, Inc." Later, Schenkman informed the investors that a portion of their funds would be invested in the stock forward contract program "to generate Short-Term Capital Losses to offset Short-Term Capital Gains this year." Like Alessandra, Schenkman telephoned Hecht at Merit and requested specific tax losses for his clients. *306 Again, Hecht recorded these targets on an FTI form. Occasionally Schenkman wrote his directions to Hecht, as when he once directed Hecht, "Per our conversation today, I hereby instruct you to realize all Short-Term Capital Gain in the year 1981 EXCEPT for $ 185,000." On November 14, 1980, Schenkman asked Hecht to "generate" through FTI $ 301,350 of "ordinary tax loss." In Merit trading initiated 6 days later, Island incurred ordinary losses in T-Bills totalling $ 302,499. [18]
Donald Haberlein ("Haberlein") was another investment advisor for clients in the Merit T-Bill option and stock forward contract markets. Haberlein's records indicate that FTI suggested to him that it could produce tax benefits in exchange for a fee equalling *307 4 percent of his client's "tax problem." Other records from Haberlein's files show that FTI/Merit was promoted as a means to defer income from one year to a subsequent year and also to convert income that otherwise would be taxed at ordinary income rates into income taxed as long-term capital gains or "LTCG." In one instance, Haberlein wrote to a client, "We recommend that FTI be encouraged to invest $ 1,538,000 of STCG (plus an additional amount equal to the ordinary loss you need this year) to LTCG. That should effectively accomplish your objectives." Haberlein's papers, however, also contain a sheet upon which he figured profitability of investing in the various stocks offered in the stock forward contracts program, apparently independent of tax considerations. The number of other investors and/or investment advisors who actually traded on the Merit markets was very few. No more than seven traded on the T-Bond market, no more than 12 traded on the T-Bill market, and no more than nine traded on the stock forward contract market. Of these, there was some overlap; Richartz, Haberlein, and Alessandra traded on all three markets. 3. The Petitioners
A. Petitioner Edward *308 A. Seykota
During taxable years 1978, 1979, and 1980, Seykota was a cash-basis taxpayer. In those years, he entered into transactions in the FTI A/C program and the Merit T-Bill option and T-Bond option markets. Richartz had discretionary authority to trade on behalf of Seykota in these transactions. Seykota apparently invested $ 1,580,000 in the A/C program in 1978. In 1978, he claimed an investment fee expense of $ 4,463 paid to FTI for the A/C Program. [19] In 1979, Seykota reported ordinary losses of $ 5,359,525 and short-term capital gains of $ 8,899,566 from the Dorchester Partners function of the FTI program, for a net gain of $ 3,540,041. Seykota also claimed an "investment expense" deduction of $ 568,389 in 1979 *309 with respect to the FTI and Merit program. Seykota's participation in the 1978 and 1979 FTI-Dorchester program produced, inter alia, the following results: 1978
Net Short-Term Capital Loss
$ (3,505,155) 1979
Net Short-Term Capital Gain
$ 3,540,041   In 1980, Seykota made a variety of investments in the FTI/Merit programs. He had two Merit T-Bill option accounts, account No. 123 and account No. 211. In 1980, FTI credited $ 800,000 to his Merit T-Bill Option No. 123. As part of the A/C program, FTI directed trading for his T-Bill option market (account No. 123) beginning in December 1980. As a result of trading in that account during December, Merit's records show ordinary income of $ 6,772,686 against a short-term capital loss of $ 11,440,241. [20] During 1980-1981, Merit's records further reflect cash debits of $ 746,917, resulting in an apparent cash out-of-pocket loss to Seykota of $ 53,083. For the years 1980 and 1981, the records of Account No. 123 show the following deferrals: 1980
Net Short-Term Capital Loss
$ (4,667,550)
1981
Net Short-Term Capital Gain
$ 4,614,470  Merit's managers credited Seykota's other T-Bill option account (No. 211) with *310 $ 20,000 on December 23, 1980. These amounts came from his T-Bond option account No. 213. The next day, the managers credited another $ 1,000,000 in cash to Seykota's account No. 211. At the end of the year, Seykota showed an ordinary loss of $ 10,685,280 attributable to Merit T-Bill option account No. 211. Early in 1981, he recovered that amount by disposing of his gain legs for a net short-term capital gain of $ 10,714,940. For the years 1980 and 1981, the records of account No. 211 show the following deferrals: 1980
Net Ordinary Loss
$ (10,685,280)
1981
Net Short-Term Capital Gain
$ 10,714,940  Early in 1981, his account was debited by $ 1,049,600 reflecting a cash gain of $ 29,660. Seykota also had two T-Bond option accounts, account No. 79 and account No. 213. Merit's managers credited $ 640,000 in cash to account *311 No. 79 on December 18, 1979. Trading in that account on December 28, 1979, generated capital losses of $ 1,264,300.66. Trading in the account on January 2, 1980, generated capital gains of $ 1,255,400. Merit debited account No. 79 by $ 631,065.98 on January 14, 1980, reducing its balance to zero, and reflecting a cash loss of $ 8,935.02. On December 10, 1980, Merit's managers transferred $ 500,000 from Seykota's T-Bill option account No. 123 to his T-Bond option account No. 79. Trades in that account on December 24, 1980, generated a capital loss of $ 691,106. Trading in that account on January 5, 1981, generated capital gains of $ 715,578. On January 6, 1981, Merit disbursed $ 524,472 from the account to Seykota, reflecting a cash gain of $ 24,472. For the years involved, a total of $ 1,140,000 was credited to Seykota's T-Bond option account No. 79 and $ 1,155,538, was debited from the account. An overall cash gain of $ 15,538 to Seykota from trading resulted from debits and credits to account No. 79. On December 23, 1980, Merit debited Seykota's T-Bond account No. 213 by $ 20,000. On the next day, however, Merit credited that account with $ 290,000. On December 31, 1980, *312 trading in that account yielded losses of $ 3,502,416 attributable to short-term capital losses in the Merit T-Bond option market. Merit's managers offset that amount by trading on January 5, 1981, which generated capital gains of $ 3,503,755. On May 6, 1981, account No. 213 was reduced to zero by debiting $ 271,339, for a cash gain to Seykota of $ 1,339. Seykota's overall participation in the Merit T-Bond program produced the following deferrals and rollovers: December
1979
Short-Term Capital Loss $ (1,264,331) January
1980
Net Short-Term Capital Gain
$ 1,255,400   December
1980
Net Short-Term Capital Loss
$ (4,193,522) January
1981
Net Short-Term Capital Gain
$ 4,219,333   During 1980, Seykota traded in enormous quantities on other markets. On his 1980 return, Seykota reported long-term capital gains of $ 47 million from all sources. His FTI and Merit trading generated $ 20 million in capital losses. Together with other losses, these trades virtually eliminated his capital gain. Of the amounts at issue in this case, Seykota additionally claimed short-term capital losses of $ 8,196,440 and long-term capital gains of $ 5,334,701 attributable to commodity *313 future transactions from FTI on his 1980 tax return. He also claimed a short-term capital gain of $ 90,954 and long-term capital gain of $ 6,135,090 attributable to transactions in physical commodities from FTI A/C Program. Seykota further claimed a deduction for investment expenses of $ 607,123 attributable to the FTI program. Seykota managed investment accounts for a number of clients. Although he was a member of the Coffee, Sugar and Cocoa Exchange from June 11, 1980 until April 23, 1982, Seykota never acquired floor trading privileges from that Exchange. Seykota never traded on the floor of any commodities exchange. To the extent he traded any commodity futures, he did so through a broker. Seykota, moreover, did not direct the trading on his own Merit T-Bill and T-Bond option accounts. Instead, he gave Richartz discretion to trade on his behalf. Seykota did not monitor Richartz' hedging activities on a regular basis. Seykota was primarily interested in the possibility of an inversion in the gold market and in holding gold as a "buffer stock." The hope of capitalizing on an inversion in the gold market was his "real play" in investing with FTI. Seykota's ordinary losses *314 attributed to FTI/Merit, as reported on his returns, bear a high correlation to his adjusted gross income (A.G.I.) computed without regard to such losses: A.G.I.
FTI/Merit
A.G.I.
Loss % of A.G.I.
Year
per return
losses
w/o loss
w/o loss   1978
$ 132,063
($ 3,505,155)
$ 3,637,218
96% 1979
$ 783,246
($ 5,359,525)
$ 6,142,771
87% 1980
$ 633,443
($ 3,912,594)
$ 4,546,037
86% B. Petitioner Robert Henry
Petitioner Henry owned and managed an auto body shop located in San Francisco. He had several years' experience investing in stocks, bonds, and real estate. One of these ventures was a limited partnership interest in Island Investments, Ltd., a California partnership formed in 1978, originally to invest in a Hawaiian hotel. Its general partners were London and Schenkman. During taxable years 1978, 1979, and 1981, Island entered into transactions in the FTI A/C program and on the Merit T-Bill option and stock forward contract markets. FTI/Merit participation was a subventure within the Island partnership, and participation was optional. Nine of Island's 22 partners, including Henry, participated in the subventure. Island's general partners gave *315 Richartz discretionary authority to trade on the partnership's behalf in the A/C and Merit T-Bill option programs. Henry transferred $ 55,200 to Island during 1979. Merit's managers credited Island's T-Bill option account with $ 103,000 on December 13, 1979. Island's Merit trading during 1979 generated ordinary losses of $ 743,341. Henry claimed, as his share, ordinary losses of $ 139,694. A debit of $ 88,560 to Island's account on January 15, 1980, resulted in a cash loss to Island in the amount of $ 14,440. On November 14, 1980, Island deposited additional cash into the T-Bill account. In 1980, Henry claimed ordinary losses of $ 148,852 with respect to Island's trading. That amount represented his share of Island's claimed losses of $ 1,136,138. In 1981, Henry claimed an ordinary loss of $ 76,490 as his share of Island's claimed Merit T-Bill losses of $ 401,439. From 1979 through 1981, FTI placed $ 198,700 of Island's funds into the T-Bill option account and paid out $ 178,822.80, resulting in a cash loss of $ 19,877.20. FTI's records show that Island's participation in the Merit T-Bill program produced the following net deferrals and rollovers: December
1979
Net Ordinary Loss
$ (570,105) January
1980
Net Short-Term Capital Gain
$ 554,965   December
1980
Net Ordinary Loss
$ (302,499) January
1981
Net Short-Term Capital Gain
$ 297,762    *316 Henry did not have a sophisticated understanding of the A/C Program. However, Henry did receive "tax planning" correspondence from Schenkman regarding his investment in FTI/Merit, and tax considerations played a role in his decision to invest. His participation, through the Island partnership, was not as direct as that of the other petitioners. Nevertheless, his FTI/Merit losses, when added to his other losses, bear a significant correlation to his adjusted gross income computed without regard to such losses: A.G.I.
A.G.I. Loss % of A.G.I.
Year
per return
Losses
w/o loss
w/o loss
1978
$ 30,297
($ 101,943)
$ 132,240  77% 1979
74,595
($ 169,731)
$ 244,326  69% 1980
79,027
($ 235,122)
$ 314,199  75% 1981
68,659
($ 157,608)
$ 226,267  70% C. Petitioner Bruce Calhoun
As Calhoun's investment advisor, Seykota traded on his behalf in an account with Drexel, Burnham, Lambert (Drexel), a brokerage firm. Seykota and Calhoun executed a contract in 1976 requiring Calhoun, on a quarterly basis, to pay Seykota 20 percent of the net appreciation obtained for Calhoun by Seykota over the previous maximum equity achieved. Calhoun paid $ 580,000 *317 to Seykota by check dated January 3, 1980. This payment related to Seykota's performance under the contract and did not reflect any specific payment for activity in the Merit accounts. In 1980, Calhoun had a long-term capital gain in the amount of $ 14,564,273 in the Drexel account. Seykota informed Calhoun about the Merit markets and discussed the tax benefits of the Merit program with him. Calhoun gave Seykota discretionary authority to trade on his behalf in these transactions. Calhoun withdrew $ 1.1 million from his Drexel account for use in the Merit program. Through Seykota's efforts during 1980, Calhoun entered into transactions in the Merit T-Bond options markets. The details of the resulting $ 5,172,000 loss are set forth, supra, to illustrate the mechanics of the option trading program. As a result of these transactions, Calhoun had an overall cash loss from his investment in Merit T-Bond options of $ 305,030. Calhoun's capital losses in 1980, as supplemented by capital losses from Merit, bear a high correlation to his $ 14,564,275 capital gain in the Drexel account, which Seykota also supervised: Capital Losses as
Year
Capital Losses Capital Gains Percent of Gains
1980
($ 12,752,627) $ 14,564,273 88%
*318 The asserted income tax deficiencies for Calhoun's 1982 year are relatively small, amounting to $ 855, although he claimed large unused capital loss carryovers from the 1980 trades. Yet his trades for that year and the year before resulted in losses from Merit T-Bond and stock forward contract trading. These bear a high correlation to gains received from Merit: Capital Losses as
Year
Capital Losses
Capital Gains
Percent of Gains
1981
($ 4,075,950)  $ 4,866,070 84% 1982
($ 4,226,404)  $ 3,928,270 108%
D. Petitioner Martin Tepper
In 1980, petitioner Tepper was a vice-president of Pic n' Save stores. Before becoming involved in the Merit/FTI program, Tepper had invested in real estate, stock, gold, and various other ventures. Schenkman became Tepper's accountant in 1978 or 1979. Tepper provided Schenkman with yearly estimates of salary and wages for tax planing purposes. Schenkman and London acted as Tepper's client representatives, and they advised him to invest in the FTI A/C program. During taxable years 1980, 1981 and 1982, Tepper entered into transactions in the FTI A/C program, and into transactions on Merit's T-Bill options, T-Bond options, *319 and stock forward contract markets. Tepper did not know the details concerning the Merit markets. He did know, however, that the FTI program could have favorable tax consequences. Tepper gave FTI discretionary authority to trade on his behalf in the A/C program and in his T-Bill option and T-Bond option accounts. On December 26, 1980, FTI withdrew $ 150,000 from Tepper's assembly account and deposited it into Tepper's Merit T-Bill account. As a result of trading in that account, Tepper claimed an ordinary loss of $ 99,616. On January 8, 1981, FTI took $ 150,692 from the T-Bill account, reducing it to zero, and returned the money to the assembly account. There was a cash gain in the amount of $ 692. Also on December 26, 1980, FTI took $ 150,000 from the assembly account and placed it into a T-Bond account. Records of the T-Bond account, however, indicate that trading had begun on Tepper's behalf some 2 weeks earlier. As a result of trading in that account before the end of 1980, Tepper claimed a capital loss of $ 370,856. On January 6, 1981, FTI closed the T-Bond account by debiting $ 140,052, for a cash loss of $ 9,048. Schenkman introduced Alessandra to Tepper. Tepper *320 gave Alessandra discretion to trade on his behalf in the Merit stock forward contract market. On November 18, 1981, Tepper's stock forward contract account (No. 675) was credited with $ 150,000. As a result of trading in that account, Tepper claimed an ordinary loss of $ 282,542 attributable to investment expenses relating to FTI and Merit. On January 14, 1982, $ 145,560 was debited from Tepper's stock forward contract account to close it out. On June 27, 1982, $ 100,000 was credited to Tepper's stock forward contract account. As a result of trading in that account, Tepper claimed a capital loss of $ 107,151 and cancellation fee losses of $ 25,614. Early in 1984, $ 88,539 was debited from Tepper's stock forward contract account. The cash records of that account indicate that Tepper incurred an overall cash loss of $ 15,901 from investments in Merit's stock forward contract program. For the years at issue, Merit's records show that Tepper's participation in the combined Merit T-Bill options, T-Bond options, and the stock forward contract market resulted in the following reported deferrals and rollovers: December 1980 Loss
$ (470,472)
January 1981 Gain
$ 461,216  December 1981 Loss
* $ (450,020)
January 1982 Gain
$ 455,580  November 1982 Loss
* $ (297,461)
December 1982 Loss
* $ (280,884)
*321 Tepper's ordinary losses, as supplemented by losses attributable to Merit T-Bill options and forward contracts, bear a high correlation to his adjusted gross income computed without regard to such losses: A.G.I.
A.G.I.
Loss as % of
Year
per return
Losses w/o loss
A.G.I. w/o loss
1980
$ 53,218
($ 99,616) $ 152,834
65%
1981
$ 75,546
($ 336,192)
$ 411,738
82%
1982
$ 53,302
[21]($ 173,878) $ 227,180
77%
*322 OPINION During the years in issue, petitioners engaged in A/C transactions through FTI and/or in spread transactions through the related Merit T-Bond, T-Bill, or stock forward contract programs. In each instance, petitioners sustained losses in the initial years of their investments. Participants in the A/C program deducted losses relating to the acquisition of gold futures contracts and the physical holding of gold. A/C program participants and other participants in the Merit programs also incurred losses by entering into closing transactions with respect to selected positions in their Merit investments. The principal issue for decision is whether petitioners may deduct losses resulting from trading in the FTI and Merit accounts. Petitioners contend that the trading at issue actually occurred, was performed in good faith, and that the trades had economic substance. Respondent, however, asserts that the FTI gold carries and Merit trades in T-Bills, T-Bonds, and stock forward contracts were either fictitious or preconceived shams or, if they did actually take place, that they lacked economic substance. General rules of procedure prevail in these cases. Respondent's determination *323 that the transactions at issue did not occur or are shams is presumptively correct, and petitioners have the burden of producing evidence to rebut the deficiency determinations. The burden of persuasion is on petitioners to substantiate the losses they have claimed. Sochin v. Commissioner, 843 F.2d 351, 355 n. 9 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985); see Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a).[22]
The A/C program initially featured spread positions in gold futures. The near-term contracts to buy ("long legs") were exercised and the gold was held in warehouses against delivery under the far-term contracts to sell ("short legs"). The articulated hope was that a profit would result because the price *324 on the ultimate sale of the gold would be greater than the acquisition and carrying costs of holding the gold. [23] *325 Prior to 1981, carrying costs were deductible in the year of payment. The gold, however, could be held for a sufficient period to permit the investor to report his gain on the sale as long-term capital gain. This arrangement thus permitted a taxpayer to utilize the deductions created by a gold carry against unrelated income in one year and to postpone taxation of related gains to the next following year. [24] Moreover, because the A/C program initially involved the establishment of spread positions in gold futures contracts, the gold carry also presented an opportunity to take advantage of the tax benefits presented by spread situations discussed below. Prior to 1981, T-Bill and T-Bond spreads presented tax planning potential because they also could be used by a taxpayer to defer tax liability on unrelated income until a later year and to convert ordinary income into short-term capital gains or long-term capital gains. This device, in its basic form, required an investor first to "open" a spread. Market forces would affect the legs of a spread inversely. If one leg appreciated, the other would depreciate. As time passed, therefore, there would be a "gain" leg and a "loss" leg. At the end of the tax year, the investor could purchase an offsetting contract to close out the loss leg of the spread so as to realize a tax loss in the first year. When he closed out this loss leg, however, he would acquire an offsetting position to replace the closed loss leg. The substitution of one position for a similar position in a different month is known as a "switch". The revised spread, created by the switch, maintained the investor's offsetting position into the *326 next taxable year. The investor would close out his position by disposing of the gain leg in the next year, presumably at a gain. The leg acquired in the switch would also be closed out, presumably at little gain or loss, assuming that it is held only a short time into the beginning of the next year. If the taxpayer maintained a "long" position into the next year, he could realize long-term capital gains when he closed the spread transaction. See Goldfein & Hochberg, "Use of Commodity Straddles Can Effect Impressive Tax Savings," 29 J. Tax. 342 (1968). The process of deferring taxes by taking losses in one year and postponing gains into the next year could, in theory, continue indefinitely. In Smith v. Commissioner, 78 T.C. 350, 365 (1982), affd. by unpublished opinion 820 F.2d 1220 (4th Cir. 1987), in connection with an argument similar to the one proposed by petitioners, we said, "If [the taxpayers'] analysis of the tax law is correct, nothing but commission costs and death would prevent a taxpayer from perpetually straddling, achieving perhaps the ultimate tax goal of permanent deferral." 1. Factual Shams
Our threshold *327 inquiry is whether the transactions were "factual shams, inspired, designed and executed * * * for the sole purpose of achieving for its investors capital and ordinary losses." Forseth v. Commissioner, 85 T.C. 127, 165 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. 800 F.2d 266 (11th Cir. 1987), affd. 808 F.2d 1219 (6th Cir. 1987), affd. 810 F.2d 197 (5th Cir. 1987), affd. 813 F.2d 293 (9th Cir. 1987). Our decision of this issue depends upon whether petitioners have proved "that there was any real market or trading, or that there was any purpose, other than the avoidance of taxes, for any of the transactions at issue." Forseth v. Commissioner, supra; Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), cert. granted on another issue U.S. (1991); Brown v. Commissioner, 85 T.C. 968 (1985), affd. sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988). If such transactions existed as fact, the question becomes one of economic substance, that is, whether *328 such transactions, even if actually proven, are nevertheless sufficient to accomplish the tax results which petitioners now urge. Respondent concedes the factual existence of the gold carry portion of the A/C program without conceding that the gold carries possessed sufficient economic substance to accomplish the claimed tax results. Respondent has, however, challenged the factual existence of transactions in the Merit option and stock forward contract markets. We accordingly decide first whether the Merit trades had a factual existence. A. The Merit Option Markets
We look at a variety of factors that characterize valid markets to determine whether petitioners have met their burden of proving that actual transactions occurred. Freytag v. Commissioner, 89 T.C. at 887; Forseth v. Commissioner, supra.That a program is conducted within a self-contained circle and is operated and controlled by the promoter and his affiliates are basic factors indicating the program is not a valid market, but really a means to sell tax benefits rather than the assets ostensibly traded. Such a closely controlled "market" may not be a market at all *329 if it does not admit traders who are free to choose their own trading strategies in attempting to make a profit and who, in attempting to make a profit, will establish fair prices for the items traded. Freytag v. Commissioner, 89 T.C. at 881. See also Demartino v. Commissioner, T.C. Memo 1986-263, affd. 862 F.2d 400 (2d Cir. 1988). The Seventh Circuit described one such arrangement as follows: In essence, therefore, appellants appeared to be utilizing the organized market, but were in fact creating a market for their transactions at the prices they established for ulterior purposes. [United States v. Winograd, 656 F.2d 279, 283 (7th Cir. 1981).]
The Merit markets were open to only a few participants. There were 81 T-Bill option accounts, and 34 T-Bond option accounts. These accounts could only trade through investment advisors who received commissions from Merit. Richartz himself was the advisor for at least 53 -- the A/C investors who were also involved in the Merit option markets. Only a few other investment advisors made trades on the T-Bond and T-Bill markets. Under agreements *330 with the investors, the advisors had virtually unlimited control over the investors' accounts. This closed circle is not characteristic of a functioning marketplace. Petitioners urge that the Merit markets were small because certain rules of the Securities and Exchange Commission required Merit to restrict its markets to individuals who had the financial resources and knowledge to participate in Merit's trading. We note, however, that maintaining an effective tax shelter is aided considerably by limiting participation to a few individuals possessing substantial financial resources and enough knowledge to appreciate the tax benefits offered by the program. In this regard, we are skeptical of Richartz' claims that it was necessary to create Merit because no other market in financial instruments would serve his purposes. It seems more likely that Richartz needed to create the Merit markets because no valid market could be manipulated to provide the tax benefits proffered to the A/C clientele. Another factor indicating Merit's lack of validity as a market is that none of the options traded ever resulted in delivery of the contracted securities. To be sure, delivery in options futures *331 is rare, but delivery under option contracts traded on valid markets does take place. In these cases, there were no deliveries. Petitioners counter that Merit was a market and that markets, as such, do not concern themselves with whether traders do, or do not, take delivery. We are not convinced that a valid market does not provide some mechanism for its orderly function. Petitioners have produced no evidence showing that deliveries were even possible. There is nothing to show that any of the petitioners (with the possible exception of Seykota) had the financial or market resources needed for making or taking deliveries of T-Bills and T-Bonds in the amounts allegedly traded. Nor is there evidence that, as is the case on valid futures markets, delivery was guaranteed by any responsible party. United States v. Dial, 757 F.2d 163, 165 (7th Cir. 1985) , citing Bernstein v. Lind-Waldock & Co., 738 F.2d 179, 181 (7th Cir. 1984). Finally, there is no suggestion that the services of an independent clearing firm were used to account for the T-Bond and T-Bill trades and to guarantee performance. See Fox v. Commissioner, 82 T.C. 1001, 1010 (1984). *332 These factors characterize a market that is a sham. Trading patterns on the Merit markets reveal the effects of control from the top instead of open market forces. Merit ostensibly made its money through its "bid/ask" structure. The "bid" was the amount paid for a purchased option on the Merit markets and the "ask" was the amount to be received. Merit retained the difference between these two amounts. Merit, however, charged fees only on its opening trades and not thereafter. Thus, Merit appeared to extend an open invitation to investors to speculate at their whim, and without paying the costs normally charged by a valid marketplace. Petitioners argue that the absence of fees was intended to promote liquidity. In view of the limited trading that took place, we think that Merit's willingness to forgo fees was spawned by its awareness that the trades would not proceed at random. It was expected that the trades would proceed along predetermined open-switch-close patterns. Merit produced huge volumes of computer-generated paperwork describing in detail each of the alleged trades. These documents reveal distinctive trading patterns that do not exist on valid markets. On a *333 valid market, a trader's trading patterns are not usually established before trading actually begins. Merit, however, matched groups of investors into sides, often explicitly labelling the sides "A" and "B." Investors on one side did not trade against each other, but only against the other side. No investor acquired an open position; everyone bought spreads. When the programs first started, every investor in the T-Bonds or T-Bills market "switched" against someone from another side on December 28, 1979, effectively postponing his gains into the next year. Everyone incurred a tax loss. In January 1980, each investor closed his transactions, but often "rollovers" were set up. Although the trading patterns became more complex in subsequent years, the programs nevertheless reveal patterns of tax-motivated transactions. The trades were still orchestrated, and traders remained in the roles to which they were assigned. The permanent assignment of investors to "sides" shows that Merit never intended trades to take place at random, as they would in the case of a profit-seeking marketplace. Petitioners urge that the patterns demonstrated by respondent are merely "arbitrary" groupings *334 of trades. The patterns that emerge from the trading, however, are too consistent for that conclusion. If petitioners' trading was not preordained, we would expect them to demonstrate specific meaningful deviations from the trade patterns shown by respondent, especially deviations resulting from profit-motivated, rather than tax-oriented, considerations. They did not do so. Moreover, year-end trading was the rule. While tax-motivated transactions do indeed take place at the end of the taxable year on valid markets, they do not do so in the proportions nor with the preordained precision of those orchestrated by Merit. Forseth v. Commissioner, supra; Fox v. Commissioner, 82 T.C. at 1017, 1026. Another difficulty with the timing of Merit trades is that, according to Merit's own records, many of the alleged trades took place well before the investor made his initial margin deposits. Merit required these margin deposits as a means of protecting itself against supposed shifts in the market value of its accounts. Yet, Tepper's trading began two weeks before his money was produced, and Calhoun's $ 5,172,000 loss came from trades initiated *335 on December 12, 1979, well in advance of his cash deposit of $ 1.1 million on December 17, 1979. Petitioners argue that the delays between the initial trades and the subsequent payment of margin deposits were short, generally only a day or two. They do not show that other markets are so tolerant as to make multi-million dollar trades based upon faith in the good will and solvency of an unknown investor. See Forseth v. Commissioner, supra, 85 T.C. at 154. Merit's tolerance becomes more understandable, however, if we assume that the trades are mere fantasy and that the multi-million dollar deals are no more substantial than the paper trail reflecting that they took place. Merit's price-setting policies further undercut its claims to legitimacy. In Freytag v. Commissioner, supra, we stated with respect to another T-Bond option situation: One aspect of the pricing is clear -- the prices were artificially generated by the pricing algorithms * * *. Having written the pricing algorithms, First Western surely understood their mathematical properties, and therefore could, and did, utilize its prices to obtain any result it desired. *336 [Freytag v. Commissioner, 89 T.C. at 880-881.]
Merit's pricing mechanisms did not involve prices set by bargaining, as is the case with ordinary markets. Instead, Merit set the prices. Merit's promotional material said, Premiums on Options will be priced according to an established pricing formula which Merit believes will result in a fair price.
Petitioners defend the validity of Merit's pricing by referring to its application of a modified Black-Scholes pricing algorithm. Yet, in the circumstances of its markets, the validity of the Black-Scholes pricing is not especially relevant. The Ninth Circuit has explained, in Enrici v. Commissioner: The absolute power to manipulate and dictate the price and timing of the artificial transactions, even if kept within the general range of the marketplace, allows a taxpayer (especially if he sets the price and time after the stated date of the transaction) to reap larger and surer tax advantages with much less economic risk than he would have had he entered into real transactions. Thus the claiming of deductions from artificial straddles that are designed to look similar to marketplace straddles, *337 if left unfettered, has a much greater potential for abuse than deductions from marketplace straddles. [813 F.2d at 296 (1987); emphasis supplied.]
Merit possessed the capacity to mold its transactions and its pricing into tax-avoidance programs. Auerbach , as a computer programmer for Merit, developed computer programs that set the prices of Merit deals to generate certain tax write-offs. Indeed, some versions of these programs refused to plot a trade unless a specific tax write-off ratio were available. Petitioners insist that the prices on the Merit exchanges were set by hard bargaining among the traders. They point to testimony of several Merit insiders who recall such bargaining. The sizeable and predictable tax losses generated by the Merit markets convince us, however, that if there was any actual bargaining, it was only over the amounts of tax losses available and the fees that would be charged for such losses. Petitioners' attacks upon respondent's evidence fail to present any instances of their own profit-motivated bargaining. In view of what happened on the markets, we see no reason to believe that any profit-motivated bargaining took place. *338 [25]
In addition *339 to scrutinizing operations, the Court's determination of a market's validity includes considering whether the market is dealing in tax benefits rather than in the assets ostensibly involved in the market's trades. Freytag v. Commissioner, 89 T.C. at 878; Forseth v. Commissioner, 85 T.C. at 165. Merit had a reputation of engaging in tax-advantaged programs. Richartz formulated target plans for potential investors. These target plans included matrices which stressed tax benefits and gave only scant mention to anticipated profits. Other Merit documents projected Merit's "tax savings" in multiples of the projected earnings from trading on Merit markets. In addition, Auerbach prepared computer programs for Merit which structured trades to generate a high ratio of tax deductions to cash investment. Petitioners argue that the tax write-off computer programs in evidence do not necessarily show that the trades at issue were guided by such programs. Nevertheless, the existence of such tax write-off computer programs shows at a minimum that Merit had the capacity to generate tax-motivated trading by computer. In view of the ultimate results, we *340 do not doubt that such computer programs were so used. The tax-related efforts of Merit's principals are modest when compared to the efforts of the client representatives or investment advisors such as Schenkman, Haberlein, and Alessandra. These promoters sold their clientele on the tax benefits of Merit's programs; they ordered from Merit the transactions their clients would need; and, with Merit's willing compliance, they delivered the tax benefits ordered. Petitioners urge that Merit and its promoters often discussed economic profits with the investors. Richartz may have been fascinated by the possibilities of profiting from commodities markets, and we do not doubt that other promoters had an incidental interest in making money for their customers in the form of economic profits. Nevertheless, we are equally certain that Richartz and the other promoters were aware that investment in the Merit programs, and the resultant fees to its promoters, only came about because the program offered substantial tax benefits. Indeed, the files of Donald Haberlein, a Merit Investment Advisor, contain Merit documents indicating that Merit will cure his client's tax concerns for 4 percent *341 of the "tax problem." Significantly, investment in the A/C gold carries and the Merit T-Bill and T-Bond straddles dropped off precipitously after passage of the 1981 ERTA legislation that severely cut back the tax benefits from such investments. It became necessary for Merit to offer instead a market in stock forward contracts, in the hope that such contracts had escaped the ERTA legislation. The drop in option business was no accident; Merit's markets plainly could not operate when their stated tax benefits were no longer available. Courts also have been suspicious of "market" arrangements which produced tax benefits far more efficiently than they produced economic profits. In Forseth v. Commissioner, supra, we found that a gold and platinum forward contracts scheme was a factual sham where the taxpayers' losses were not only remarkably responsive to their tax needs in 1980, "[but] also predictably so." 85 T.C. 127 at 153. Here, too, results of Merit trades were responsive to the investors' tax needs. Tepper's Merit options and stock forward losses, when combined with losses from other sources, offset between 65 percent and 82 percent of his *342 adjusted gross income for each of the years 1980, 1981, and 1982. Henry added Merit options losses to deductions from other sources to offset 70 to 75 percent of his adjusted gross income for 1979, 1980, and 1981. Calhoun used his $ 5.172 million capital loss from Merit with other losses to offset a $ 14 million capital gain. And Seykota, who advised Calhoun in his Merit transactions, offset between 86 and 97 percent of his own ordinary income with ordinary losses from the FTI/Merit markets. The unrealistic accuracy in predicting the amounts of given tax deductions further persuades us that the trades producing such precise losses lack economic substance. In Freytag v. Commissioner, supra, we found that another T-Bill and T-Bond futures venture was a factual sham in part because of the promoter's "uncanny ability to produce almost precise tax results." 89 T.C. at 878. Merit's client representative Schenkman predicted in June 1979 that Henry would achieve ordinary losses of $ 141,844 from FTI. FTI in fact produced ordinary losses to Henry of $ 139,694. It thus delivered 98.48 percent of the losses predicted. For the next year, Schenkman *343 predicted that Merit investments would produce, inter alia, ordinary losses of $ 1,100,000. Merit delivered losses totalling $ 1,136,000, or 103.29 percent of the losses promised. The most impressive precision is that outlined in the facts for Island's account No. 55, where Schenkman requested ordinary losses of $ 301,350. Within 45 days, Merit made precisely enough T-Bill trades to generate losses of $ 302,499, or 100.38 percent of the amount requested. Petitioners point out that some of Schenkman's correspondence also mentions profits. For example, referring to the "gold investment," Schenkman wrote, "We have made 59.92 percent on our investment in 22 months." It seems obvious from the context that, to the extent they are valid, these figures reflect only unrealized appreciation on the highly-leveraged margin amounts invested and that the actual return, when the investor's borrowings are taken into account, would be much lower. Additionally, because of the structure of the program, it is likely that the unrealized appreciation would be wiped out on the subsequent transactions used to generate tax losses. Petitioners have not tied Schenkman's figures to actual trades, and *344 the fact remains that the principal emphasis of the letter is obtaining long term capital gains (40 percent included in income) and an ordinary loss (100 percent deductible from income). Schenkman predicted tax losses, not economic profits, accurately. The above factors, taken together, lead to the conclusion that the Merit T-Bill and T-Bond markets were factual shams. The Merit markets were closed circles of relatively few investors whose trading was accomplished by a handful of insiders. Merit's promoters overtly marketed it as a tax shelter, with only incidental mention of anticipated profits. Moreover, the Merit markets were ones whose traders never made, or never took, delivery of the products ostensibly traded. For that matter, the traders demonstrated neither the capacity nor the intention to make or take such delivery. Nevertheless, Merit instituted multi-million dollar trades on their behalf, often before they deposited required margins, or even became fully known to the Merit managers. Unlike valid markets, Merit charged its fees only on the initial trade, traded only in spreads, and assigned its traders to opposite "sides" and then waltzed them through preordained *345 open-switch-close transactions. Merit's computers set the prices in those transactions and, as programmed, deliberately produced tax losses that met the investors' tax needs with uncanny precision. Moreover, when legislation eliminated the tax benefits available from the Merit's T-Bill and T-Bond options, business in those markets dropped dramatically. In sum, the alleged trades on the Merit markets were not trades at all. They were only computerized bookkeeping entries that had no existence other than as justifications for the tax losses at issue. The Merit markets were, in effect, situations in which "the broker simply scribbles prices in an account book which generate the desired pattern of losses and gains, and the investor reports these accordingly." Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). We find that the Merit option trades were factual shams and hold that the gains and losses generated by the putative trades on the Merit markets have no effect for tax purposes. Respondent's determination in this regard is sustained. B. The Merit Stock Forward Contract Program
*346 The Merit stock forward contract program suffered from the same infirmities as did the option programs. The market again was a closed circle in which only 62 investors and only a few investment advisors participated. The same open-switch-close pattern characterized its trading. Again, there was a consistent pattern of deliberately incurred first year losses. Petitioners all incurred first year losses, and they have failed to show that any other investor acquired a gain in his first year in the stock forward contract markets. Any gain was postponed until the next year, or even to later years. Again the prices were set, not by negotiation, but rather by computer, in a sort of "cost-of-carry" program. The stock forward contract program stressed tax benefits. Although Congress halted the use of the straddle losses which characterized the Merit options programs in 1981, Merit's promotional brochure for the stock forward contract program urged that stock forward contracts were not subject to that legislation. The investment advisors knew about the stock forward contract program's tax implications. Writing to clients, Alessandra ignored mention of any profits or lack of profits *347 in the Merit stock forward contract programs. Instead he advised that he was working to create "ordinary loss and no other tax consequences" for the year and to transform gains into long-term gains in the following year. The Merit Tutorial program stressed tax deductions rather than earnings from the stock forward contract program, indicating that deductions were available in multiples of anticipated earnings. Merit's trade blotters for the stock forward contract accounts reveal that cancellations played a suspiciously large role in closing out investors' transactions. The Court has disapproved the use of cancellations as a means of generating tax losses in forward contract situations. In Brown v. Commissioner, 85 T.C. at 994, we pointed out: The use of a cancellation to close, dispose of, or settle a forward contract is not a common practice by dealers. For the most part, cancellations are used by such dealers only to correct errors.
In Freytag v. Commissioner, supra, the Court characterized the use of cancellations in stock forward contract situations as a "device * * * far different from those in the 'real world'." 89 T.C. at 881. *348 The Merit stock forward contract brochure, however, pointed out the advantages to using cancellations rather than sales or exchanges to eliminate a contract on a favorable tax basis: Under these circumstances, such investor may take the position that losses, if any, realized upon the cancellation of a Forward Contract are ordinary losses, on the basis that a cancellation is not a "sale or exchange" for tax purposes and thus, that the "sale or exchange" prerequisite to capital gains treatment has not been met.
Moreover, Alessandra administered Merit stock forward contract trades which generated more than $ 2 million in cancellation fee deductions for one client, more than $ 1 million in such fees for another, and almost $ 200,000 in such fees for Tepper. Merit's opinion as to the tax advantages of forward contract cancellations combine with its frequent use of such cancellations to expose a program far removed from a genuine market. Forward contracts, unlike futures contracts, generally result in delivery of the underlying asset. Yet the Merit stock forward contract market, like its other markets, allegedly traded in products which, at least during the year in question, *349 were never delivered. Lack of product delivery is not characteristic of trading on a valid market. Lack of product delivery also undercuts testimony offered by petitioners that some Merit traders undertook forward trading in stock as a hedge. Some traders urged that they sought forwards in stock of companies that dealt in precious metals as a means of hedging their own dealings in the precious metal markets. In such cases, we think, an effective hedge would have involved delivery of the stock involved. The records of the stock forward contracts are, in petitioners' own words, "ponderous." They consist of many thousand of pages of computer printouts in several bound notebooks and are not very informative. Unlike the T-Bill and T-Bond option transactions, records of the stock forward contract trades were not processed into meaningful databases. An examination of the records as presented does not assist the Court in deciding whether the transactions at issue actually took place. Notwithstanding the mass of computer paper, we have no basis to believe that the printouts signify anything other than the promoters' "scribbles" that exist solely to reflect desired gains and losses *350 for tax purposes. See Yosha v. Commissioner, supra.[26]
The closed circle of investors, open-switch-close trading, computer-generated pricing, tax-oriented *351 promotions, frequent use of cancellations, lack of delivery or the ability to make or take delivery, and the failure to show profit-maximizing trading all combine to show that the Merit stock forward contracts, like the T-Bill and T-Bond options, are factual shams. Freytag v. Commissioner, 89 T.C. at 882. We find that the trades had no factual basis. We accordingly decide that they have no effect for tax purposes. 2. Shams in Substance
Even if transactions made in the Merit markets had a factual basis, they may still fail to possess economic substance. Put differently, the positions might not be "sufficient to accomplish the tax results which petitioners contemplate." Glass v. Commissioner, 87 T.C. 1087, 1172 (1986), affd. sub nom. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), *352 affd. sub nom. Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989), and affd. sub nom. Lee v. Commissioner, 897 F.2d 915 (8th Cir. 1989). As such, they would be "shams in substance." A sham in substance, as opposed to a factual sham, exists when a series of transactions actually does take place but has no business or profit-making function apart from obtaining tax benefits. Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). The parties to such a transaction may, for example, enter into binding contracts. If their goal in doing so is not part of the conduct of a profit-making enterprise, their transaction will be disregarded as a sham "though all the proceedings have their usual effect." Helvering v. Gregory, 69 F.2d 809, 811 (2d Cir. 1934), affd. 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935). In this case, respondent contends that both the Merit markets and the gold cash and carry aspect of the A/C trades should be ignored for *353 tax purposes because they lacked economic substance and were, thus, shams in substance. Courts have scrutinized straddle transactions as shams in substance by considering both an objective economic substance analysis and a subjective business purpose or profit motive analysis with respect to the transactions at issue. Brown v. Commissioner, 85 T.C. 968 (1985), affd. sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1985). In Sochin, the Court of Appeals stated: the consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the realm of income tax losses. [843 F.2d 832 at 834.]
We consider first the objective economic substance analysis. A. Economic Substance
"Economic substance" is an objective test which involves a broader examination of whether the substance of a transaction reflects its form and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction. *354 Casebeer v. Commissioner, 909 F.2d 1360, 1365 (9th Cir. 1990), affg. a Memorandum Opinion of this Court, citing Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987). Spread and straddle transactions, like those at issue here, are shams in substance or economic shams if "losses, either ordinary or capital, are intentionally incurred in year one, followed by countervailing gains in year two or in many instances later, as a result of rollovers." Glass v. Commissioner, 87 T.C. at 1172. In these cases, "the intentional skewing of the transactions to realize year one losses" effectively precludes "the chances of economic success." As such, these transactions are "contrary to objective economic realities and have no economic substance beyond the expected tax benefits." Falsetti v. Commissioner, supra.
(1) The FTI A/C Program
Respondent concedes the factual existence of the gold carry transactions that comprise the principal portion of the FTI A/C program. Petitioners have demonstrated that they entered into futures contracts for gold and took delivery pursuant to *355 those contracts. Through FTI, they established elaborate borrowing and brokerage arrangements with Chase and Merrill Lynch, or with Shearson. Respondent instead challenges the gold carry trades as lacking economic substance and, thus, being "shams in substance." As he did with regard to the Merit options markets organized for the stated purpose of hedging the gold carries, respondent asserts that the gold carries themselves cannot be given effect for tax purposes. We cannot conclude, on the evidence before us, that the A/C program had economic substance. Petitioners have failed to prove from an objective standpoint that the transactions were likely to produce economic benefits aside from tax deductions. Their own records show that each investor deliberately incurred first-year economic losses, and they have failed to prove the existence of any first-year trading gains for tax purposes -- indeed, such gains would have been inconsistent with the purposes of the program. If there were facts underlying the specific trades at issue that would show likely economic benefits to the A/C gold trading -- after payment of the fees involved and after "hedging" in the Merit market -- we believe *356 that petitioners would have presented them. They have not. The proof adduced in support of the A/C program contrasts markedly with that in cases where we have given effect to gold carries, such as King v. Commissioner, 87 T.C. 1213 (1986), supplemental opinion 89 T.C. 445 (1988). There, the taxpayers set forth fully and candidly the economic and tax aspects of a trader's specific dealings in gold, presenting a basis for a decision that the dealings were economically viable and entered into for profit. Moreover, the taxpayer was a trader who had no transaction costs other than interest and storage costs. In the present case, there is no such proof and no basis for assuming that the missing evidence would prove petitioners' case. Perhaps most importantly, the A/C program did not display the most basic characteristics of economic substance -- the possibility of economic profit or loss. The court in Yosha v. Commissioner, 861 F.2d 494, 500 (7th Cir. 1988), affg. 87 T.C. 1087 (1986), described as a "fake transaction" one which "had no economic substance." It explained: That would clearly be the case where *357 the broker guaranteed the investor that the only consequences of the straddle would be tax consequences; there would be no market risks, downside or upside. Straddles that involve no market risk are not economically substantial straddles and hedges; they are artifices created by accomplices in tax evasion, the brokers. And that is what the record shows.
Initially, we are convinced that the A/C program was sold for its tax consequences. Richartz marketed the program as a tax shelter, presenting sophisticated multi-faceted analyses of the tax ramifications of an investment. The assumed profits in his presentations served only as a factor in illustrating the principal point of the program, which was the substantial tax advantage to investing. In 1979, computer analysis performed by FTI included a client's tax target in computations regarding a client's A/C program. The A/C program functioned in a closed circle consisting of Richartz, his associates, and a small group of "investment advisors" who were commissioned to bring worthy investors into the program. The investment advisors and associated client representatives aggressively marketed the A/C plan as a tax shelter, offering *358 and providing precise tax losses and deferrals in substantial amounts. The program charged substantial fees, but there is no showing that the fees were reasonable or that any trades in the gold futures market produced profits for the participants in excess of these fees. Moreover, FTI's management, the "brokers" of the A/C program, set up a system that eliminated any business risk, "downside or upside" beyond the amounts each participant would invest. The administration of the program plainly served to eliminate "upside" potential. The A/C gold investments were all initiated in the form of spreads; any appreciation in one leg would be accompanied by a depreciation in the other leg. And when the participants actually acquired the gold (in the form of delivery certificates held as security by Chase), the gold was hedged. Any appreciation in the value of the gold caused by a change in interest rates would therefore be offset by depreciation in the countervailing hedge. Accordingly, both the spread and hedging mechanism served to limit any profit potential in the gold carries. The structure of the program provided additional limits on "upside" profits. Even without the spread *359 and hedging mechanisms, it appears that the gold carry program was not regarded as an economically viable exercise. In Julien v. Commissioner, 82 T.C. 492, 508 n.11 (1984), we noted, "There appears to be a paucity of discussion of cash and carry straddles in the commodity literature, except in an income tax context." It thus appears unlikely that the FTI gold carries would make a profit in view of the extensive array of hedging, other costs, and the fees charged by FTI, by Chase, and by Merrill Lynch. Petitioners have not provided the specifics to prove otherwise. FTI also protected the participants from "downside" risk. The FTI agency agreement limited a client's risk to the amount of his initial cash contribution. Richartz set up trading so that a client's "margin" requirements were equal to the largest amount of money a client could lose on any given trade. We have considered the evidence that indicates at least some of the A/C participants later agreed to increase their amounts "at risk" to 200 percent of their investment. Petitioners further contend that, together with Chase, they were liable to creditors under the banker's acceptances issued as part *360 of the program. These factors, even if true, fall short of showing any genuine and appreciable risk to the participants in the A/C program as it was administered. Petitioners' additional arguments in support of their contention that the A/C programs possessed economic substance are equally unconvincing. Petitioners make generalized arguments that profits were possible. Their arguments do not address the manner in which FTI/Merit conducted the program in an investor's first year. Their arguments thus fall far short of substantiating claims that the program was profit oriented. As we said in Glass v. Commissioner, supra: Petitioners argue that under the * * * transaction, there was a reasonable prospect for a profit. This argument conveniently overlooks the fact that in the critical year -- the loss year -- there was no prospect for any profit, for any other result would have destroyed the raison d'etre for entering into the * * * transactions in the first place. [Glass v. Commissioner, 87 T.C. at 1174.]
The fact that, after the initial loss years, there may have been some incidental profits does not affect our conclusion *361 that the A/C transactions lacked economic substance. [27] As we said in Freytag v. Commissioner, supra, "the fact that there may have been winning participants does not answer the question whether the transactions were primarily entered into for profit. While petitioners testified that their primary motive or intent was to make a profit, the documents and the parties' actions direct a different conclusion." 89 T.C. 849 at 885
Petitioners' best efforts to document the A/C transactions amount to accountants' reports that present annual summaries of the investor's A/C program. These reports, however, fall short of demonstrating economic substance. They do not reflect specific amounts traded in gold or in options. Additionally, *362 respondent has demonstrated that these reports are incomplete as to many of the FTI accounts addressed. In other instances, the accountants' reports are inconsistent with the stipulated databases which set forth the Merit aspects of the A/C trades. For example, the accountants' reports and the databases each show Island's T-Bill trading resulted in an overall loss of $ 43,779. For Seykota, however, the accountants' reports show a gain in Merit trades of $ 6,275, while the databases for the same Merit accounts show the total to be a loss of $ 2,659. Moreover, the accountants' reports do not deal with the tax gains and losses at issue here. They instead mix figures for actual economic income and expenses with figures for accrued trading gains or losses. Instead of describing the particulars of the gold cash-and-carry transactions at issue, the reports add together the Merit option and forward trading -- which we have found to be shams -- as integral parts of the A/C program. [28]
*363 Petitioners summarize these summaries in Table A to their brief. That table lists, per investor, the annual economic gain or loss as set forth in their accountant's reports. The table shows total pre-tax gains after 6 years of A/C trading of $ 857,410. Their table also shows that slightly less than 70 percent of the investors made economic profits on the A/C trades. Respondent counters with his Table XXXI, wherein he has addressed the same accountant's reports, but excluded the Merit market trades from the A/C transactions. Respondent also removes the interest income earned on investor deposits, urging that such income does not result from trading in the Merit markets. Respondent's revised table leaves, in effect, only the gold carry transactions. Respondent's revisions show total cumulative 6-year losses of $ 2,774,761 in the gold carry program, with 40 of 60 investors, or slightly less than 70 percent, having lost money in an economic sense. Respondent further urges that, of the investors with economic gains, some were "inside" entities associated with, or controlled by, Richartz. [29]
*364 It is instructive to view the A/C gold carry results in isolation. The Merit programs cannot lend support to the validity of the A/C gold carry program since the Merit programs lack both factual and economic substance. FTI's superimposition of the Merit markets onto the gold carry aspect of the A/C program did, however, have one consistent effect -- it guaranteed first year losses. Petitioners' tables show that, in each instance, the A/C investors lost money in the first year of their investment. Respondent's revisions, however, show that when the Merit trades are eliminated, ten of the 60 accounts would have posted gains for that first year. There is no economic substance to transactions -- such as petitioners' inclusion of the Merit trades -- that guarantees losses: "But deliberately to incur an expense greater that the expected gain * * * is the antithesis of profit motivated behavior; such a transaction lacks economic substance." Yosha v. Commissioner, 861 F.2d at 498. [30]
*365 Even if we were to assume accuracy in petitioners' Table A, however, on closer examination, the economic profits it suggests are unimpressive. Seykota showed economic gains of $ 284,667 over the 3-year period he was involved in the A/C markets. Respondent's revisions to the A/C tables show Seykota incurring economic losses of $ 418,571 over the same period. Yet, accepting for the sake of argument petitioners' profit figures, Seykota's A/C gain is based upon an investment averaging $ 12 million (most of it bank loans) over that 3-year period. Seykota's profits represent approximately a 2.37 percent return on his investment over that period. On an annualized basis, the return is approximately eight-tenths of one percent per year. On the other hand, in one year alone, Seykota's participation in the A/C program generated, on paper and for tax purposes, more than $ 13 million in capital losses and more than $ 11 million in income reported at long-term capital gains rates. [31] Plainly the tax ramifications of the A/C program were pre-eminent and the alleged economic profits, in the context of Seykota's dealings, are incidental. *366 The amount invested by Island in the A/C program averaged approximately $ 2.68 million for each year involved, most of it in the form of bank loans. The reported profits amounted to some $ 63,995 for the three-year period. (Respondent counters that Island lost $ 27,910.) Again, the return upon investment, even under petitioners' figures, is approximately eight-tenths of one percent per year. Island also, however, claimed short-term capital losses of $ 861,710 in 1979 [32] and $ 1,492,651 in 1980. It reported a long-term capital gain of $ 427,570 for 1979 and $ 1,106,726 in 1980. Again, the tax aspects of participation in these markets far overshadowed the merely incidental economic returns. *367 Petitioner Tepper allegedly earned $ 19,838 in the A/C program, while respondent's revisions show him losing $ 41,524. Petitioners' records, however, show that these putative earnings were solely interest paid upon Tepper's investment, over a 14-month period, of $ 500,000 in the program. Apparently the interest income was paid on his assembly accounts. That interest would have totalled $ 70,545 on an annualized basis, a return of an acceptable 12.1 percent. (During the same period, for example, Island was paying bankers' acceptances at a discount rate of 14 percent, and demand loans for its A/C transactions at a 15.75 percent.) Tepper's losses and expenses for the A/C program, however, amounted to $ 50,780, and reduced his earnings to the $ 19,790 figure, or an annualized return of 3.4 percent. That trading, at the same time, enabled Tepper to defer recognition on income of more than $ 450,000, through a series of deferrals and rollovers, for a period of 3 years. In terms of economic substance, Tepper would have been better advised to put his money in a bank, where it could draw interest at the going rate. Again, however, the tax aspects of the A/C program dwarfed the incidental *368 economics and demonstrated the real reasons for the existence of the Merit markets. The accountant's reports, in sum, fall short of demonstrating that the programs had the potential to produce economic benefits rather than tax losses. The stipulated exhibits also include a wealth of bank statements for Seykota's and Island's assembly accounts, for their operating accounts, and for their "security accounts." The exhibits also contain Merrill-Lynch commodity account statements for Seykota and Island. These exhibits contain a huge mass of figures from which we can gather no meaning other than the undisputed fact that such accounts actually existed. These figures do not affect our conclusion that petitioners have failed to prove that the transactions that may have been reflected in those accounts possessed economic substance. Petitioners argue that their gold carries could profit from an inversion. While this is theoretically correct, petitioners have not established how much the prices would have to invert before they would earn an economic profit, especially in view of the substantial fees charged by FTI and the fees owed to participating brokers and bankers. Petitioners have *369 also largely ignored the fact that gold has not inverted, at least since World War II. [33] They urge that the price of gold was "volatile" during the years at issue, but present no specific instance of the volatile prices yielding a profit on their holdings in gold. *370 Nor have petitioners answered respondent's suggestion that the investors could not have sold the gold fast enough to profit on an inversion, when Chase held the warehouse receipts for the gold as security for lending the money to acquire the gold in the first place. Petitioners point to the participation of the reputable Chase Manhattan Bank and Merrill Lynch brokerage firm as evidence of the validity of the A/C program. The participation of these entities was only tangential. Chase loaned money to the participants, and in return, as petitioners themselves point out: First, investors paid interest to Chase in connection with demand loans used for various margin financing and purchases of physical metal. Second, investors paid interest and fees for bankers acceptances. Third, investors paid fees to Chase to cover Chase's cost of monitoring its collateral and managing the loan accounts.
Chase's minimal participation in the A/C program does not lend support to its validity. Chase assumed virtually no risk since the advances made to FTI's investors were fully secured by gold bullion. When the gold was delivered to a warehouse for storage, the warehouse receipts were remitted *371 to Chase, not the individual investors. For its part, Merrill Lynch charged brokerage fees and maintained substantial margin requirements on the purchase of gold futures contracts, as it would have done for any client. The distance that the bank and the brokerage house maintained from the Merit programs is illustrated by the testimony of Demitrie Comnas, an official of Chase who handled the FTI transactions. Comnas was favorably disposed to his former customers, and testified -- With respect to the cash-and-carry positions that we financed, it is my judgment that all had economic purpose. With respect to other transactions that were not viewed by us with an eye towards their financeability or ultimate financing by the bank, [i.e., the Merit markets] I really have no opinion, because I did not examine them for economic purpose.
That testimony indicates no more than the witness' belief that a gold carry, in isolation, has a profit potential, and that is a proposition we accept. Comnas did not, however, endorse the entire A/C program, with its potential for open-switch-close transactions not only in the futures contracts themselves, but also in the Merit markets, as well. *372 There is no indication that Comnas, or his employer, was aware of the extent to which the FTI/Merit programs would be used for tax purposes instead of mere speculation in gold prices. Nor is there any basis to find that the Securities and Exchange Commission ever passed upon the validity of the Merit markets. Evidence in the record only shows that Merit was registered with the SEC as a broker and dealer. That does not constitute Governmental approval of the operation of Merit "markets." Equally unpersuasive was the testimony of Avram Salkin, an attorney who invested in the gold carries. Salkin testified that his H&S partnership made $ 300,000 in profits, but petitioners' own exhibits show that H&S actually lost $ 10,028. Salkin may have been referring to paper gains during the second year of a traditional tax straddle, but these gains are merely part of the overall tax straddle scheme and do not demonstrate that the straddle possessed economic substance. The steep drop in participation after the 1981 legislation which diminished the tax advantages of gold carries and straddles makes us doubtful of claims that the A/C program possessed economic substance. If the A/C program *373 had the economic value its proponents claimed, FTI might well have continued the program, even in light of legislation. We do not accept petitioners' arguments that a 1981 drop in gold prices caused participation to fall off. It is disingenuous for petitioners to argue that FTI's supposed mastery of the gold markets vanished at the same time the tax legislation was enacted. [34]
In view of the closely-controlled, loss-generating, tax-flavored nature of the FTI promotion, and in view of the fact that the program effectively ended following legislation that diminished its tax benefits, petitioners clearly were aware of the need to show that the A/C gold carry could be distinguished from other arrangements *374 which we have found to be shams. Petitioners, however, failed to show that profits were sought over tax losses, that the hedging was appropriate, and that there were reasonable prospects of economic success. The record concerning the gold carry operations is devoid of such proof. This lack of records and analysis is a marked contrast to the extensive records detailing every trade in the Merit option and forward contract programs, programs which otherwise lack factual substance. The fact remains that petitioners have not met their burden of proof on this issue. Respondent's contention that the A/C program lacked economic substance is sustained. (2) The Merit Markets
We have earlier concluded that the Merit option and stock forward contract programs were factual shams. Certain factors which led us to that result, including the closed-circle market of investors, the overt marketing of the programs as tax shelters, the setting of prices by computer, the lack of deliveries, and the derivation of tax losses directly related to the investors' needs, also combine to support our conclusion that the Merit programs lacked economic substance, as well. In addition to these facts, *375 the record provides an additional basis for our finding that the Merit programs were economic shams. In similar situations, we have disallowed losses incurred in the first year of a straddle because the entire program was a sham in substance, when there was no potential for any profit "in the critical year -- the loss year." Glass v. Commissioner, 87 T.C. at 1174. Without exception, the Merit investors invested in the form of spreads. Their hope for economic profit lay in holding the spreads to earn economic gains on the price differentials as they changed with respect to the different legs of the spreads. In every instance, however, the petitioners deliberately took substantial first-year losses by engaging in "switch" transactions that gave them year-end tax losses in each of their Merit accounts. This Court's decisions do not condemn year-end tax planning in business transactions primarily entered into for profit. It is when the goal of the transactions in the first place is to produce year-end losses -- when, as we said in Glass v. Commissioner, 87 T.C. at 1176, petitioners are "actually skewing the transaction for the sole purpose *376 of obtaining expected tax benefits" -- that the transactions are shams in substance and without effect for tax purposes. The results of first-year investing for the Merit T-Bill and T-Bond option programs are as follows: Name--Account
First year gain (loss)
Program
Seykota--No. 123
($ 4,667,555.85) T-Bill
Seykota--No. 211
(10,685,280.00)  T-Bill
Seykota--No. 79 (1,264,331.19)   T-Bond
Seykota--No. 213
(3,502,416.00)   T-Bond
Tepper---No. 205
(99,616.00)      T-Bill
Tepper---No. 215
(370,856.00)     T-Bond
Calhoun--No. 197
(5,172,000.00)   T-Bond
Island---No. 55 (570,105.27)     T-Bill
This first-year loss phenomenon for petitioners is paralleled by the other investors in the Merit T-Bill and T-Bond accounts. The first-year loss experiences are the same for the later Merit stock forward contract accounts. Again, petitioners traded only in spreads, and, thus, their only hope of profit came from the possibility of a favorable change in the difference between the two legs of their stock forward spreads. Once again, however, petitioners who participated in the stock forward contract program all experienced substantial losses on year-end switches, whether by cancellation, *377 offset, or assignment: Name--Account
First year gain (loss)
Seykota--No. 645
($ 10,955,700.00)
Island---No. 651
(489,980.00)     Tepper---No. 675
(252,960.00)     Calhoun--No. 695
(4,075,950.00)   This pattern of first-year losses, with no apparent regard for profits, apparently held true for all the investors in the stock forward contract program. Moreover, there is no evidence that any stock forward contract investor made a net economic gain in the first year. There was no economic substance to these transactions. B. Business Purpose/Profit Motive
We must also consider whether petitioners entered into the gold carry and Merit market transactions with a primary profit motive. Since, in the FTI program, petitioners' participation involved both gold carry and Merit transactions, and because these transactions were interdependent, it is not possible to decide whether petitioners had a profit motive for the gold carry transactions separate from their motives for the Merit market transactions. Thus, we apply the business purpose prong of the "sham in substance" analysis to the FTI and Merit transactions in combination, recognizing the interrelated nature of these *378 programs as components of an overall scheme to generate tax benefits. The business purpose, or profit motive, test forms a part of the accepted analysis of whether transactions are shams that must be disregarded for tax purposes. Sochin v. Commissioner, supra; Dewees v. Commissioner, 870 F.2d 21, 33-36 (1st Cir. 1989), affg. 87 T.C. 1087 (1986). The "business purpose" analysis is a subjective test that involves an examination of the subjective factors motivating a taxpayer to enter into the transaction at issue. Casebeer v. Commissioner, 909 F.2d 1360, 1364 (9th Cir. 1990), citing Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. a Memorandum Opinion of this Court. The business purpose test is whether the activity was entered into "with the dominant hope and intent of realizing a profit." United States v. American Bar Endowment, 477 U.S. 105, 110 n. 1, 91 L. Ed. 2d 89, 106 S. Ct. 2426 (1986), citing Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982). Equally important, profit motive *379 is also required by the provisions of the Internal Revenue Code governing the transactions at issue. Section 165(a) allows deductions for losses "sustained during the taxable year and not compensated for by insurance or otherwise. A loss, to be deductible under that section, must be "incurred in a trade or business," or "incurred in any transaction entered into for profit." Similarly, investors in commodities spread or straddle transactions entered into before June 23, 1981, may deduct losses only if they meet the requirements of section 108 of the Deficit Reduction Act of 1984, Pub.L. 98-369, 98 Stat. 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub.L. 99-514, 100 Stat. 2817-2818. Section 108 specifically applies the requirement of profit-motivated activity to the "spread" or "straddle" transactions of participants in the Merit market. In this case, petitioners Henry, Calhoun, and Tepper are investors who must meet the statutory requirements of investing primarily for profit. Freytag v. Commissioner, 89 T.C. at 882-884; Glass v. Commissioner, 87 T.C. at 1167. As a dealer in commodities, Seykota's case may be different *380 by operation of section 108(b) of the Deficit Reduction Act, supra; we address his alternate contentions later in the opinion. With respect to the Merit markets, all petitioners relinquished discretionary trading authority over their accounts to investment advisors. They invested in programs where the promoters not only invented the markets, but also set the prices in those markets. Petitioners accepted huge year-end losses without comment, secure in knowing that the losses were significant only for tax purposes. They merely watched as the gains, which followed the losses, were rolled over in a 2 or 3-year series of deferrals of taxable income. These actions are not consistent with a profit motive. Although petitioners testified as to their profit motives, we have learned to place more confidence in objective facts rather than in the obviously self-interested recollections of the taxpayers or their associates in deciding the profit-seeking intent of any petitioner before this Court. Cherin v. Commissioner, 89 T.C. 986, 994 (1987). In all their A/C or Merit trades, petitioners have produced no evidence of any sacrifice of the tax losses for the sake *381 of economic profits. Petitioners' testimony is nevertheless instructive on the issue of whether they possessed a profit motive. Petitioners knew little about Merit's operations, and they had an especially difficult time explaining how the programs were to earn profits for them. Calhoun's testimony was particularly striking. He went to Seykota, his advisor, with a tax problem -- a $ 14 million capital gain. Seykota enrolled Calhoun into the Merit T-Bond program and, within 12 days, Calhoun achieved a $ 5.172 million capital loss. Calhoun was not especially concerned about this loss, however, and did not discuss it with Seykota. His reaction to the $ 5.172 million loss strongly suggests that Calhoun relied on Seykota to balance losses against gains. Any alarm was directed at having too much income, or too much exposure to taxes on that income. With respect to Calhoun's profit motive, the obvious conclusion is that he had very little or none. He was primarily in the Merit markets for tax losses. Henry understood little about the Merit programs. Since he was a limited partner in Island, the deductibility of his losses is determined at the partnership level. The proper focus *382 with respect to his losses is on the intent of the general partners. Ewing v. Commissioner, 91 T.C. 396, 417 (1988). Accordingly, the true emphasis of Henry's investment strategies through the Island partnership is revealed in correspondence from Schenkman, who was the general partner of the Island partnership as well as its client representative in the FTI and Merit programs. Schenkman accurately predicted the ordinary and capital losses which Henry and other partners would incur from FTI. He was accurate in predicting that they would achieve long-term capital gains and an ordinary loss of approximately $ 1,100,000 on their total investment of $ 487,000. Schenkman thereafter invested a portion of Island's funds in the stock forward contract program to generate short-term capital losses. Schenkman's emphasis on tax benefits, rather than profits, is unmistakable. Tepper knew least of all about the program. He knew only that the Merit programs would have favorable tax consequences. He did not recall the offering material nor did he recognize any of the documents he signed to get into the Merit programs. He could not explain how the Merit programs would *383 make a profit. He delegated all his investment decisions to Schenkman and London, the duo who also advised Island. Tepper lost $ 10,000 on the Merit T-Bill and T-Bond accounts in 1980 and approximately $ 5,000 on the Merit stock forward program in 1981. His trading on these markets, however, enabled him to defer taxation on approximately $ 450,000 over the 3-year period of his Merit participation. There is no objective reason to believe that Tepper had a primary profit motivation in the Merit programs. Instead, like the other Merit investors, the emphasis in Tepper's investment program was obtaining tax losses. Seykota knew the most about the Merit programs. He was experienced in the markets and understood that an inversion was a potential means to profit from the FTI gold carry program. His testimony was far from convincing, however, in justifying an inversion in the gold market as his "real play." It revealed hopes for significant profits from holding gold as a "buffer stock" during a global crisis that would drive prices of spot gold to double its value. Nevertheless, he offered no examples of such events having taken place in the past, and no analysis of the prices he *384 would need to earn a profit on the holdings that generated the tax losses at issue. Seykota was aware that Merit could offer $ 5.172 million in deductible losses to his client Calhoun, with little economic risk. Seykota also took advantage of FTI's tax benefits himself. He traded in enormous quantities and, on his 1980 return, he reported capital gains of $ 47 million. On his 1980 return alone, Seykota reported that FTI generated $ 23 million in capital losses on his behalf which partially offset his capital gains. Seykota testified concerning his meetings with Richartz -- We didn't discuss my taxes. * * * I think I asked him what the tax characteristic of these instruments was. * * * But I wasn't -- I didn't give him tax targets or I didn't have tax targets to give him.
The notion that Seykota -- who over 3 years claimed approximately $ 18 million in losses from switch transactions in the Merit markets -- did not discuss his taxes or tax targets with Richartz strikes us as improbable. His testimony engenders the same response that we described with respect to another veteran trader in Miller v. Commissioner, 84 T.C. 827, 835 (1985), revd. 836 F.2d 1274 (10th Cir. 1988): *385 [35]
It is probably true that petitioner, a sophisticated commodity futures trader, hoped that in some fashion he might make an overall profit or at least break even. Petitioner's entire business life * * * has many aspects of professional gambling. We are convinced that petitioner had at least an incidental profit motive in every business transaction which he entered including these gold straddles, but his contention that he was unaware of, or indifferent to, the tax consequences of the switches in position * * * is simply not believable. Petitioner's intelligence, his experience in commodity futures trading, and his sophistication as a businessman and commodities trader belie his efforts to convince us that he was not fully aware that realization of a tax loss * * * was the primary motive for his entering into this series of gold straddle transactions. * * *
*386 The testimony, in fact, reflects a lack of candor that has not helped Seykota in our evaluation of his claims. Under these circumstances, Seykota's claim that he was primarily in the FTI/Merit program for profit rings hollow. The substantial tax benefits generated by the FTI/Merit program were far more important to him. When Congress changed the tax laws and eliminated the tax benefits previously available from the FTI gold carry and the Merit option programs, petitioners abandoned those programs. They instead followed their advisors' suggestions and invested in the Merit stock forward contracts market. They all took first-year losses in the stock forward contracts market, as they had done in the earlier Merit programs. Calhoun lost $ 4,075,950; Tepper lost $ 450,010; Island (with Henry as a partner) lost $ 489,980; and Seykota lost $ 10,955,700. They also all lost money, in an economic sense. In our view, no profit-seeking investor would have stayed with the Merit programs as long as petitioners did. The fact that they stayed with the FTI/Merit programs shows that the programs delivered to petitioners what petitioners sought -- tax benefits to offset other income. As *387 we discussed earlier, some investors may have had relatively small economic gains from their FTI/Merit investments. Petitioners, however, have presented almost no proof in the form of cancelled checks or other documents that they ever received such profits. There is nothing to indicate that any actual cash gains were anything other than amounts shifted from the cash deposits of other investors who, in the Merit scenario, incurred losses. Moreover, the alleged gains are negligible in comparison to the claimed tax benefits. In sum, reports of such income do not affect our conclusion that tax benefits, not economic profits, were the ends sought by the petitioners herein. Petitioners were aware that the goal of a tax straddle is to "move" a certain quantity of income into a future year and possibly to convert it into long-term capital gain. In theory at least, the process of moving income and its taxation into future years can be continued indefinitely. Our conclusions about petitioners' tax objectives, as opposed to profit motives, are borne out by the amounts in which the deferrals and rollovers took place. For each of petitioners, the initial losses offset substantial income, *388 eliminating taxation on that income in the initial year of the transactions. These initial losses were generally followed by equivalent, slightly smaller, gains. The payment of taxes on these postponed gains was often delayed further, however, into additional years by the practice of setting up another straddle. If there were a convincing case for investing in the FTI/Merit programs, apart from obtaining huge tax benefits, we would have seen it. But that convincing case, in our view, does not exist. Petitioners' primary motives were not to make profits, but rather to reduce taxes. Accordingly, petitioners have failed to show that their investments were not shams in substance, and they have failed to show that they meet the requirements imposed by section 165 and by section 108 of the Deficit Reduction Act for the deductions claimed. In view of our decision that the transactions were shams, it is unnecessary to address respondent's alternative contentions that, under section 465, the petitioners were not at risk with respect to the transactions involved, or his contention raised by motion that, under section 446(b), petitioners' claiming the deductions yielded by the trades *389 in issue failed clearly to reflect their income. 3. The Per Se Rule of Section 108(b)
Petitioner Seykota urges that he is entitled to deduct the losses at issue by virtue of certain statutory provisions applicable to commodities dealers. [36] As noted above, investors generally may deduct straddle losses only if they can demonstrate either that the losses were incurred in a trade or business or that they had entered into the transactions primarily for profit. Section 108(b) of the Deficit Reduction Act, supra, provides a special rule in the case of commodities dealers: (b) Loss Incurred in a Trade or Business. -- For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.
*390 It is settled, however, that transactions involving straddles which are not in fact bona fide will not be subject to the provisions of section 108. Sochin v. Commissioner, 843 F.2d at 353 n.6; DeMartino v. Commissioner, 862 F.2d 400 (2d Cir. 1988), affg. in part and revg. in part a Memorandum Opinion of this Court; Glass v. Commissioner, 87 T.C. at 1176; see H. Rept. 99-426 (1985), 1986-3 C. B. (Vol. 2) 911. Seykota urges that he qualifies as a commodities dealer by virtue of his membership in the Coffee, Sugar and Cocoa Exchange. He concludes that, under section 108(b), he is presumptively deemed to have incurred the losses at issue in a trade or business. We decided above, however, that the FTI/Merit trades were not bona fide. We ruled that they were shams and had no business or profit-making function apart from generating tax deductions. Section 108 was not intended to provide a deduction for the losses at issue in this case, including any incurred by Seykota if he qualified as a "commodities dealer." See Glass v. Commissioner, supra.Accordingly, Seykota is not entitled to the *391 special provisions available under section 108(b). 4. Deductions for Management Fees
Respondent, in an amendment to his answer filed July 31, 1989, seeks to disallow Calhoun's deduction of $ 580,000 in management fees he paid to Seykota in 1980. Respondent bears the burden of proof as to this issue, which he raised for the first time in an amendment to his answer. Rule 142(a). Seykota was Calhoun's investment advisor who traded on his behalf in an account with Drexel, Burnham Lambert ("Drexel"), a brokerage firm. Seykota and Calhoun had a contract requiring Calhoun, on a quarterly basis, to pay Seykota 20 percent of the net appreciation obtained for Calhoun by Seykota over the previous maximum equity achieved. Calhoun paid $ 580,000 to Seykota by check dated January 3, 1980, written on the Drexel account. This payment related to Seykota's performance under the contract, and did not directly reflect any payment for activity in the Merit accounts. Respondent urges that part of Calhoun's management fees should be attributed to Seykota's role in steering Calhoun through the Merit program. He urges that a taxpayer cannot deduct fees relating to obtaining tax benefits in *392 transactions that are not bona fide. See Zmuda v. Commissioner, 79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). The difficulty with accepting respondent's position is that Calhoun has demonstrated that the fees at issue were paid for Seykota's involvement in the Drexel account, pursuant to prearranged contractual terms. The amount of Calhoun's payment reflects that arrangement since the amount was geared directly to capital appreciation in the Drexel account. Respondent has not overcome Calhoun's proof. Specifically, respondent has not shown a connection between the fees at issue and the Merit activity. Respondent has failed to establish that the payments are not ordinary and necessary business deductions. Accordingly, Calhoun is entitled to a deduction for the fees involved. The case is different, however, with respect to other fees that petitioners paid to Merit. Petitioners have the burden of showing that respondent's determination is erroneous and how the fees at issue are properly deductible. This they have not done. Zmuda v. Commissioner, supra.
5. The Interest Expense Deduction for Amounts Paid to *393 Chase
Section 163 of the Internal Revenue Code permits "a deduction for interest paid or accrued within the taxable year on indebtedness." There is no requirement that the interest be incurred in a trade or business, or in an activity engaged in primarily for profit. Thus, a deduction for interest paid will be allowed when it is paid on a valid, existing indebtedness even when the transaction of which the debt is a component lacks economic substance. Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). No deduction will be allowed, however, where the debt was entered into solely to obtain a tax deduction. Goldstein v. Commissioner, 364 F.2d 734, 742 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Sheldon v. Commissioner, 94 T.C. 738 (1990). In this case, FTI borrowed funds on Seykota's behalf from Chase. FTI obtained the loan to finance the purchase of gold positions. Records indicate that interest was paid to Chase by Seykota or on his behalf for the use of borrowed funds. The records further show that Seykota advanced sufficient funds to Merit to cover the cost *394 of borrowing. Seykota has claimed interest deductions related to his participation in the A/C program in 1979 and 1980, respectively. Respondent disallowed these deductions. There is no reason to believe that the loans from Chase were anything other than valid indebtedness, even though we have found that the application of the proceeds was part of a transaction that lacked economic substance. We therefore hold that Seykota has established his entitlement to the interest deductions paid to Chase to the extent claimed on his returns for 1979 and 1980 and reflected in the Chase "Loan Department Interest Statements." 6. Additions to Tax and Increased Interest
A. Negligence
Respondent determined that petitioners Calhoun, Henry, and Tepper are liable for the additions to tax for negligence for the years in issue. Section 6653(a)[37] imposes an addition to tax equal to 5 percent of the underpayment if any part of any underpayment is due to negligence or intentional disregard of rules and regulations. Respondent also determined that Calhoun, Henry, and Tepper are liable for the additions to tax for negligence under sections 6653(a)(2) for 1981 and for 1982. Section 6653(a)(2) *395 imposes an additional liability of 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that respondent's determination that they were negligent, or intentionally disregarded the rules and regulations for each of the years in issue, is erroneous. Warrensburg Board & Paper Corp. v. Commissioner, 77 T.C. 1107, 1112 (1981); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). For purposes of these sections, "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985), citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo 1964-299. Petitioners argue *396 that they were not negligent because the losses were properly deductible and, even if the losses were not deductible, that they relied upon competent advice in claiming the deductions at issue. We have already addressed petitioners' first contention and sustained respondent's disallowance of the FTI/Merit trading deductions at issue. As to the other contention, we do not believe that any of the petitioners did what a reasonable and ordinarily prudent person would do under the circumstances. Calhoun, Henry and Tepper were all sophisticated businessmen. Nevertheless, they invested in programs whose promoters invented the markets involved and created the trading prices by computer. Petitioners generally did not monitor the programs as they were being administered. They accepted without complaint large losses from the FTI/Merit programs and were not concerned when their tax returns reflected those losses. This is not ordinarily prudent behavior. We cannot accept the excuse that petitioners relied upon the advice of competent professionals. The competent professionals upon whom they claim to have relied were the very people who put them into the Merit programs, and most of these *397 "professionals" were compensated for doing so. We believe that an ordinarily prudent taxpayer, when presented with a plan so obviously contrived to generate substantial tax deferrals, would at least have consulted an independent attorney or tax accountant before undertaking his venture with FTI/Merit. None of the petitioners did so. The additions to tax for negligence are sustained. B. Increased Interest
Respondent determined that Calhoun, Henry, and Tepper are liable for increased interest on an underpayment attributable to a tax-motivated transaction as defined in section 6621(c).[38] Petitioners have the burden of showing respondent's determination is erroneous. Respondent amended his answer to assert increased interest under section 6621(c) against Seykota. Law v. Commissioner, 84 T.C. 985 (1985); Sundstrand Corp. v. Commissioner, T.C. Memo 1986-531. As to Seykota, it is respondent's burden to show the applicability of the statute. *398 Section 6621(c) (formerly section 6621(d)) provides for an increase in the interest rate where there is a substantial underpayment (an underpayment exceeding $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." Section 6621(c)(3) defines tax-motivated transactions to include "any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092)," sec. 6621(c)(3)(A)(iii); "any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period," sec. 6621(c)(3)(A)(iv); and any sham or fraudulent transaction, sec. 6621(c)(3)(A)(v). The increased interest rate is effective as to interest accruing after December 31, 1984 (the date of enactment of the original section 6621(d)), even though the tax-motivated transaction was entered into prior to that date and "regardless of the date the return was filed." H. Rept. 98-861 (Conf.), 1984-3 C.B. (Vol. 2) 239; Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Petitioners *399 argue that the increased interest rate should not apply because the subject transactions were not factual shams, had economic substance, and were entered into for profit. Respondent argues that the transactions at issue were "shams or fraudulent transactions" and "transactions not entered into for profit." We have decided that all aspects of the FTI and Merit programs constituted factual shams and/or shams in substance. We have further held that petitioners lacked a primarily for profit motive for both the FTI and Merit transactions. Petitioners have failed in their burden of showing the inapplicability of section 6621(c). With regard to Seykota, respondent has met his burden of showing that Seykota is liable for increased interest under section 6621(c) and his determination that all other petitioners are liable for increased interest under section 6621(c) is sustained. The parties have made additional arguments under section 6621(c). Petitioners attack as overbroad and, thus, invalid respondent's temporary regulations that treat as a tax-motivated transaction "any deduction disallowed for any period under section 165(c)(2) relating to any transaction not entered into for profit." *400 Sec. 301.6621-2T, Q-4 and A-4, Temporary Proced. & Admin. Regs., T.D. 7998, 1985-1 C.B. 368, 49 Fed. Reg. 50394 (Dec. 28, 1984). Respondent claimed in his reply brief that the arrangements herein were straddles within the scope of section 6621(c)(3)(iii), supra. In view of our conclusion that the Merit and FTI transactions were shams, it is not necessary for us to address these additional contentions. C. Failure to File
Respondent also determined that the Teppers were liable for an addition to tax computed under section 6651(a)(1) for failure to file a timely return. The burden of showing the determination as incorrect is on the Teppers. Rice v. Commissioner, 14 T.C. 503 (1950). In the absence of any evidence on this point, respondent's determination must be sustained. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert B. Henry and Jane Henry, docket No. 47868-86; Bruce L. Calhoun and Jacqueline R. Calhoun, docket No. 6720-87; and Martin S. Tepper and Lauri E. Tepper, docket No. 31972-87.↩
2. By order dated May 7, 1990, Mr. Seigel was granted leave to withdraw as counsel for petitioners Bruce L. and Jacqueline R. Calhoun (docket No. 6720-87). ↩
3. By Order dated Nov. 10, 1990, Messrs. McDonough and Hindlian were granted leave to withdraw as counsel for the petitioner in docket No. 14936-82.↩
4. Except as otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
5. Respondent also determined in the deficiency notices that Henry, Calhoun, and Tepper were liable for increased interest on substantial underpayments attributable to tax motivated transactions for each of the years at issue under sec. 6621(c), formerly sec. 6621(d). By amendment to his answer, filed June 28, 1989, respondent claimed that Seykota was also liable for increased interest under sec. 6621(c)↩. *. For 1980 and prior years, the addition is under sec. 6653(a). 6. Respondent also determined that Mr. & Mrs. Tepper were liable for an addition to tax pursuant to sec. 6651(a)(1) for the following tax years and in the following amounts: ↩
1980
$ 17,457
1981
$ 50,606
1982
$ 14,311
7. In addition, FTI clients maintained a "security account" at Merrill Lynch. These accounts apparently contained positions in Treasury bill futures -- not options -- as reflected in monthly statements of Merrill Lynch.↩
8. To be consistent with the parties' usage, we have described the offsetting positions as "spreads." These positions, however, also come within the definition of the term "straddle" as that term is used in the Internal Revenue Code. See Katz v. Commissioner, 90 T.C. 1130, 1136 n. 12 (1988); Perlin v. Commissioner, 86 T.C. 388, 390↩ n. 8 (1986). 9. The record in this case is less than clear as to the uncontroverted operations of options and the nature of Treasury obligations. We have, therefore, supplemented the discussion by consulting explanations of applicable general principles in Fox v. Commissioner, 82 T.C. 1001↩ (1984).
10. In a switch transaction, an investor would close out the leg of his spread which has depreciated in value. He would simultaneously replace that leg -- "the loss leg" -- with a new position to offset the gain leg, which he had retained. The investor would claim a loss for tax purposes as a result of closing out the loss leg. See Perlin v. Commissioner, 86 T.C. 388, 392-393 (1986); Miller v. Commissioner, 836 F.2d 1274, 1275 (10th Cir. 1988), revg. 84 T.C. 827↩ (1985).
11. As demonstrated below, the tax impact of this gain was mitigated by a further deferral -- Calhoun's acquisition of a corresponding short-term capital loss of $ 4,075,950 through the Merit program in 1981.↩
12. Richartz and RPV, a partnership in which he was involved, each engaged in one additional trade in the 1980 T-Bill sequences. In one other sequence, No. 12, there were only two trade dates, but the sequence nevertheless generated ordinary losses.↩
13. For example, in trade No. 200, on June 11, 1980, Merit's account 211 bought 30 T-Bond calls, at a strike price of $ 960,625. The same amount is sold on the same date by Merit's house account, No. 111, in trade No. 210.↩
14. The only documentary evidence of delivery of assets in any of the Merit markets pursuant to an option or forward contract discussed at trial occurred after the years at issue: (1) The delivery of Tandy stock to an individual investor in Oct. 1983, which was redelivered the following month; and (2) The delivery of Zapata stock to an investor partnership in Nov. 1983.↩
15. Rivera v. Commissioner, 89 T.C. 343↩ (1987).
16. The figures reflect the total losses of Island Investments, Inc., a partnership in which petitioner Robert B. Henry was a limited partner and in which he claimed his distributive share of losses.↩
17. Although respondent issued a subpoena to London, he declined to testify, advising the Court that he would invoke his privileges under the Fifth Amendment↩, pursuant to an investigation regarding an unrelated matter. In lieu of his testimony, the Court received into evidence the prior deposition of London.
18. During the years at issue, Treasury bills were specifically excluded from the definition of a capital asset by sec. 1221(5). Accordingly, petitioners reported losses on T-Bill transactions as ordinary losses. See Fox v. Commissioner, 82 T.C. 1001, 1004↩ n.6 (1984).
19. Not at issue in this case is Seykota's claimed ordinary loss for 1978 of $ 3,505,155, later adjusted by respondent, attributable to T-Bill options in the Dorchester Partners market. FTI clients used the Dorchester partners market prior to Merit's creation of its own T-Bill option market.↩
20. It was stipulated by the parties that Seykota claimed a loss of $ 12,241,348, but the documents in evidence disclose the figure used in the text. The discrepancy is not explained.↩
*. The Dec. 1981 figure includes cancellation fee losses of $ 197,069. The 1982 figures include cancellation fee losses of $ 25,614, which are at issue in this case.↩
21. Unlike other years, the ordinary loss component of Tepper's 1982 Merit transactions is a relatively small amount, some $ 25,614. Unrelated partnership losses comprise most of the ($ 173,878) figure. The Merit capital loss and capital loss carryovers, however, totalling $ 120,265, are also at issue for that year.↩
22. The burden of proof is on respondent, however, to the extent he seeks increased deficiencies in docket. No. 6720-86 and to the extent he claims increased interest under sec. 6621(c)↩ in docket. No. 14936-82.
23. Respondent has moved to strike portions of petitioners' brief in which petitioners cite certain treatises in discussing the mechanics of option or future markets. These citations, however, are either to propositions that are noncontroversial matters or to works that have been relied upon by respondent's expert. Moreover, the Court has not found it necessary to rely upon any of these citations in deciding the issues of fact or law herein. Respondent's motion will accordingly be denied. 24. See the discussion in Hirai v. Commissioner, T.C. Memo 1984-495↩.
25. By post-trial motion filed Mar. 20, 1990, petitioners again seek the admission into evidence of their Exhibits 313, 314, 403, and 404. These exhibits were computer-generated graphs showing alleged profit potential of the Dorchester or Merit trades, assuming that the trades were driven by market forces. At trial, in the exercise of our discretion, we ruled that these graphs went beyond the scope of a "chart, summary or calculation," within the meaning of Rule 1006, Federal Rules of Evidence.↩ For the same reason, petitioners' motion will be denied. Since we find that FTI/Merit rigorously controlled the profit and losses generated by trading in the Merit markets, it follows that market forces had nothing to do with the Merit prices except to lend a starting point at which the Merit profits and losses could be created. The graphs showing putative profit potential for open market trades are thus irrelevant, and, even if they were admitted into evidence, they would have no impact on the Court's opinion.
26. In his post-trial brief, respondent prepared an Appendix XV in which he purports to adjust accountants' reports submitted by petitioners to reflect only economic gains and losses in the A/C stock forward contracts program. Respondent concludes from the table that all petitioners incurred economic losses in their participation in the A/C program. The table, however, appears to lack information concerning a number of stock forward contract accounts, nor does its summaries refer directly to the underlying data. Petitioners have filed a motion to strike Appendix XV. We have not considered that table in deciding that petitioners have failed to bear their burden of showing that the A/C program was administered for profits, rather than for tax benefits. Accordingly, petitioners' motion to strike that portion of the brief will be denied as moot.↩
27. See, e.g., Walker v. Commissioner, T.C. Memo 1990-609↩: "The tax benefit of the straddle so far outweighs the economic profit that we cannot accept petitioner's contention that he was primarily motivated by the desire to earn a profit."
28. Citing the provisions of Fed. R. Evid. 803(6)↩, petitioners have moved to strike Respondent's Exhibit MT, which respondent cited in support of an attack on the validity of accounting records. We have accepted petitioners' argument that Exhibit MT referred only to the situation as it existed prior to the beginning of trading in the Merit markets. Since we have not relied on Exhibit MT for our findings of fact herein, petitioners' motion will be denied as moot.
29. In a post-trial motion, petitioners moved to strike respondent's opening and reply briefs. Their principal complaint focuses upon respondent's use of appendices. The cited appendices contain information, derived from evidence before the Court, that is important in determining the economic validity and profit potential of the transactions at issue. Moreover, some of respondent's appendices, such as Nos. XXX and XXXI, merely respond to petitioners' own appendices. The motion will be denied.↩
30. We cannot accept Richartz' self-serving testimony that it was necessary for him to create the Merit markets as a hedge for the gold carries. Petitioners have not convinced us that other, independent, and effective means of hedging their gold carries were not available. More to the point, petitioners have not shown how the Merit trading, as reflected on their tax returns, functioned as a reasonable hedge to their positions on the gold market. The results of trading on the Merit markets leave us with the conclusion that tax losses, not effective hedges, were involved.↩
31. The figures showing the amounts of petitioners' deferrals and rollovers during the years involved are derived from respondent's proposed findings of fact. Respondent's citations indicate that the proposed figures are correct. Notwithstanding the provisions of Rule 151(e), petitioners have declined to accept or deny these proposed findings. Under these circumstances, we infer that petitioners do not object to those findings.↩
32. Some part of the T-Bill option losses claimed by Island for 1979 apparently resulted from trading on the Dorchester market. The same may be true of other petitioners. The validity of trading on that market is the subject of a separate proceeding in this Court. As to the specific petitioners and years before us, however, there is no evidence in the record as to the validity of the Dorchester market. Accordingly, any disallowances arising from Dorchester trading as it relates to the petitioners and years before us is sustained.↩
33. In finding a lack of gold inversions, we have relied upon testimony from respondent's expert. The testimony does not prejudice petitioners. If there were a countervailing history of profitable gold inversions, we are certain petitioners would have presented it, regardless of respondent's expert. In a post-trial motion, petitioners renewed their efforts to exclude that expert's report and testimony from evidence. They urge that the expert is biased in favor of respondent and that his testimony so greatly exceeded his expertise as to cause the Court to exclude it. Petitioners also cite Rule 143(f) in their motion as a basis for excluding the testimony. The same expert's testimony has been accepted in other cases by this Court, and by appellate courts in determining that certain straddle or spread transactions were shams. We reject petitioners' contention that his prior appearances on behalf of respondent demonstrates bias. Nor is his report "tainted," as "inconsistent with reality" as was the situation with respect to another expert in Laureys v. Commissioner, 92 T.C. 101 (1989). Respondent's expert also mentioned tax benefits as a likely reason for the Merit trades, which, on motion, petitioners argue is inconsistent with our holding in Laureys. His doing so, however, is not forbidden by Laureys; indeed Rule 704, Federal Rules of Evidence, permits an expert to testify as to an "ultimate issue" such as the motives of petitioners in this case. Finally, the expert's testimony is not inconsistent with this Court's Rule 143(f). Under that rule, the Court has discretion to permit direct testimony as to pertinent matters by expert witnesses. Due to the complex nature of the transactions, the Court permitted such breadth from petitioners' expert witness over respondent's objections. The Court extended equal leeway to respondent's witness, and although petitioners complain, they have not demonstrated any resulting prejudice. Petitioners' motion will be denied. See Sochin v. Commissioner, 843 F.2d 351, 355 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968↩ (1985).
34. Petitioners urge that, by 1981, the 3-year term for most A/C investors had expired. Petitioner Tepper, however, invested in 1980. Moreover, the fact that some investors' originally-planned participation would expire in 1981 is no bar to extension or renewal of the program, if it possessed economic substance.↩
35. In Miller v. Commissioner, 84 T.C. 827, 844 (1985), revd. 836 F.2d 1274 (10th Cir. 1988), we reasoned that a taxpayer needed only prove a "reasonable expectation of profit" to qualify for straddle deductions under sec. 108 of the Deficit Reduction Act. The Tenth Circuit reversed, concluding that to sustain the trading losses at issue, the taxpayer was required to prove that his primary motive for entering into the straddle transactions was profit. Meanwhile, Congress adopted the position taken by the Tenth Circuit. In 1986, Congress amended sec. 108 retroactively to impose the primarily for profit standard. It is that standard we now apply. See Boswell v. Commissioner, 91 T.C. 151, 159↩ (1988).
36. By motion filed on June 12, 1989, Seykota sought to amend his petition to permit the application of loss carrybacks from years not before the Court to the years here involved. We granted that motion with the understanding that, because this case was in a test case posture, the issues to be tried in this proceeding would be limited. The question of whether Seykota may be entitled to offset carryback losses against deficiencies determined in this proceeding is a collateral issue which the parties will hopefully resolve without need for further trial. Assuming that this collateral issue is resolved, the Rule 155 computations will take such issue into consideration.↩
37. Sec. 6653(a)(1)↩ for years after 1980.
38. Sec. 6621(c) provides in pertinent part: (c) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. - (1) In General. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) Substantial Underpayment Attributable to Tax Motivated Transactions. - For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000.↩